CITY OF MADISON, Plaintiff-Appellant,

v.

MADISON PROFESSIONAL POLICE OFFICERS
ASSOCIATION, Defendant-Respondent-
Petitioner.

Supreme Court

*No. 86–0915. Argued May 31, 1988.—Decided June 23, 1988.*

(Also reported in 425 N.W.2d 8.)

For the defendant-respondent-petitioner there were briefs by *Richard V. Graylow* and *Lawton & Cates, S.C.,* Madison and oral argument by *Richard V. Graylow.*

For the plaintiff-appellant there was a brief by *Larry W. O'Brien,* assistant city attorney, with whom on the brief was *Henry A. Gempeler,* city attorney, Madison and oral argument by *Larry W. O'Brien.*

Amicus curiae briefs were filed by *Bruce Meredith,* staff counsel for Wisconsin Education Association Council, Madison and *Gordon E. McQuillen* of *Cullen, Weston, Pines & Bach* for District 1199W/ United Professionals for Quality Health Care, Madison.

HEFFERNAN, CHIEF JUSTICE. This case comes to us on a petition by the Madison Professional Police Officers Association (MPPOA) to review a decision of the court of appeals.[1] In that decision, the court of appeals reversed the order of the circuit court for Dane county, Susan Steingass, circuit judge. The circuit court held for MPPOA and resolved the dispute over the applicability of the City of Madison's residency requirement to the members of the MPPOA, by finding that under MPPOA's "me too" clause,[2] because the city had moderated the residency requirement for another group of city employees, the MPPOA members must also be allowed to live outside the city. The court of appeals reversed, finding that the City of Madison's residency ordinance controlled over the "me too" clause of the MPPOA contract, and that therefore MPPOA members had to abide by the residency requirements. Because we conclude that the court of appeals erred, we reverse the court of appeals and reinstate the arbitrator's award. Hence, we hold that, under MPPOA's "me too" clause, the MPPOA

---

[1]*City of Madison v. Madison Professional Police Officer Association,* 138 Wis. 2d 360, 405 N.W.2d 774 (Ct. App. 1987).

[2]A "me too" clause is one which gains for the employees in whose contract it appears concessions which another second group of employees have won under the second group's contract. For two examples, see *infra,* notes 3 and 5.

members are not bound by the City of Madison's residency requirement.

This case is but a manifestation of an ongoing dispute between the City of Madison and the unions representing its employees over the applicability of the city's residency ordinance to the union members. The ordinance in question, Madison General Ordinance (MGO) sec. 3.27, reads in relevant part:

> "No person shall be eligible for ... employment ... unless he shall reside in the City of Madison unless permission to reside outside of the City of Madison shall be expressly granted by the Mayor. In the event that any such City ... employee ... shall cease to reside in the City of Madison, his ... employment shall be automatically forthwith vacated ...."

This ordinance has been unchanged since 1956.

The underlying problem in this case began in 1970, when the City of Madison accepted federal funds for its bus system. This aid was provided under the Urban Mass Transit Act (UMTA), 49 U.S.C. sec. 1601 *et seq.* Section 13(c) of the UMTA provided that, as a condition of receiving federal funds, the city had to make "equitable arrangements" to protect the employees "affected by such assistance." Among other things, the city had to preserve all rights under existing collective bargaining arrangements.

The bus employees were employed by the private Madison Service Corporation, and represented in collective bargaining by the Teamsters Union. Although it was assumed that bus employees were not city employees, from 1970 to 1983, that union and the city executed 23 different "13(c)" agreements, designed to maintain the employees' "arrangement" as

mandated under the UMTA sec. 13(c). Each of these agreements contained a clause which allowed the bus system employees to live anywhere.

In 1983, the city and the Teamsters Union, as a result of discussions between them, and also of an NLRB ruling, agreed that the bus system employees were city employees. As a result, the 24th 13(c) agreement, ratified in November of 1983, provided that the employees were now to be subject to the city residency ordinance. However, the new agreement also contained a clause stating:

> "The City and the Union agree that all employees employed on or before the 31st day of October, 1983, shall not be subject to any Ordinance requiring residency in the City of Madison as a condition of employment."

This agreement eventually triggered many problems, including the one at the root of the instant case, because other contracts which the city had with the unions representing its employees contained so-called "me too" clauses.

In *City of Madison v. Local 311, International Association of Firefighters,* 133 Wis. 2d 186, 394 N.W.2d 766 (Ct. App. 1986), a case which is the predecessor of the case at bar, the Madison Firefighters' "me too" clause was at issue.[3] In that case, the Firefighters filed a grievance, claiming that the city, by making an exemption for the bus system employees

---

[3]That clause read:

"All members of the Fire Department shall be required to live within the City limits as a condition of employment. However, in the event that the City waives the City residency requirement for any group of employees, the requirement for members of the Fire Department shall be deemed to be waived."

who had been employed before October 31, 1983, had waived the residency requirement for another group.

The matter went to arbitration, where the Firefighters argued that it, too, should not be held to the residency requirement. The city countered with an argument that the exemption to the bus system employees had been mandatory under UMTA because, under UMTA, the city was required by federal law to maintain preexisting agreements, and sec. 13(c) of UMTA preempted local ordinances.

The arbitrator held for the Firefighters, on the grounds that UMTA was not meant to preempt local law and that, therefore, the city had in fact waived the requirement for the bus system employees. The city appealed the arbitrator's award to the circuit court. That court overturned the award; but on further appeal to the court of appeals, the arbitrator's award was reinstated. The court of appeals reasoned that, because its only function in reviewing an arbitrator's award was to determine whether the arbitrator made a decision so wrong as to amount to "manifest disregard" of the law, and because the arbitrator's award did not fit that category, the award must be upheld. *Local 311 Firefighters,* 133 Wis. 2d 191–92. The net result of the case was to allow the firefighters to live anywhere they desired, regardless of the Madison residency ordinance.[4]

The case at bar resembles *Local 311 Firefighters.* As in that case, the conflict here arises over the "me too" clause in the MPPOA contract,[5] and its interac-

---

[4]Petition for review to this court was denied.

[5]That clause, contained as Art. XXII, sec. b, of the MPPOA contract, reads in relevant part:

tion with the Madison residency ordinance. In this case, as in *Local 311 Firefighters,* the arbitrator in the grievance procedure rejected the city's argument concerning the mandatory nature of the concessions to the Teamsters under UMTA and ruled for the union on the grounds of waiver.

Specifically, the arbitrator here reasoned that, when the city by ordinance adopted the Teamsters Union contract, which allowed the bus system employees hired before October 31, 1983, to live wherever they wanted to, the city had moderated the residency requirement found in MGO sec. 3.27. Therefore, because the residency ordinance was moderated with respect to one group of employees, the MPPOA "me too" clause operated to waive the residency requirement for the police. Arbitration Award, WERC A/P M–84–228 (1985) at 10.

In addition, the arbitrator determined that, because the firefighters were allowed to live anywhere, this too triggered the MPPOA "me too" clause.[6]

The circuit court in this case upheld the arbitrator's award in its entirety, noting that the arbitrator's

"The Employer's application of City Ordinance Sec. 3.27 for members of the Association shall be the same as applied to all other City employees. Any moderation to City Ordinance Sec. 3.27 shall be applied to the employees represented by the Association."

[6]Actually, because the Firefighters award was in the process of being appealed, the arbitrator recognized that it did not operate to trigger the MPPOA clause during the pendency of the appeal. However, the arbitrator held that, if the Firefighters award was upheld, then it would operate to trigger the MPPOA clause. Arbitrator's Award at 13.

Because the Firefighters award was upheld by the appeals court, the arbitrator's holding concerning the effect of that award went from being conditional to being a completed holding.

award was due great deference. The court of appeals, however, overturned the arbitrator's award on the ground that the arbitrator, while due great deference, had nonetheless exceeded his authority, because he had held that the terms of the MPPOA contract superseded the language in an ordinance. The court of appeals found this result erroneous, because this court, in *WERC v. Teamsters Local No. 563*, 75 Wis. 2d 602, 250 N.W.2d 696 (1977), had held that an ordinance overcomes the terms of a contract. Hence, the court of appeals found that the arbitrator had made an error of law of such magnitude that, despite the deference due his decision, the decision must be overturned.

Our decision to reverse the court of appeals in this case and uphold the arbitrator's award rests on two grounds. First, we hold that the arbitrator did not exceed his authority and, hence, because of the deference due his decision, it must be reinstated. Second, we hold that, to the extent *Teamsters Local No. 563* conflicts with this holding, that case is overruled.

Turning first to the arbitrator's award: The rule concerning the deference due arbitrators' awards is settled law in this state. In the 1962 case of *Dehnart v. Waukesha Brewing Co.*, 17 Wis. 2d 44, 51, 115 N.W.2d 490 (1962), this court stated that, in reviewing an arbitrator's award, this court would not substitute its judgment for that of the arbitrator because "[t]he parties contracted for the arbitrator's settlement of the grievance. ..."

Hence, the role of a reviewing court in the arbitration context is essentially supervisory, with the goal of assuring that the parties are getting the

arbitration that they contracted for. *Milwaukee Board of School Directors v. Milwaukee Teachers' Education Association,* 93 Wis. 2d 415, 422, 287 N.W.2d 131 (1980). Because arbitration is what the parties have contracted for, the parties get the arbitrator's award, whether that award is correct or incorrect as a matter of fact or of law. *Oshkosh v. Maintenance Employees Union Local 796–A,* 99 Wis. 2d 95, 103, 299 N.W.2d 210 (1980).

Further, the court will not overturn the arbitrator's decision for mere errors of law or fact, but only when "perverse misconstruction or positive misconduct [is] plainly established, or if there is a manifest disregard of the law, or if the award itself is illegal or violates strong public policy." *Milwaukee Board of School Directors,* 93 Wis. 2d at 422. *See also Scherrer Construction Co. v. Burlington Memorial Hospital,* 64 Wis. 2d 720, 729, 211 N.W.2d 855 (1974). These narrow grounds for overturning an arbitrator's award are echoed in the controlling statute on arbitration, sec. 788.10, Stats., and especially in sec. 788.10(1)(d).[7]

---

[7]Section 788.10, Stats., reads in relevant part:

**788.10 Vacation of award, rehearing by arbitrators. (1)** In either of the following cases the court in and for the county wherein the award was made must make an order vacating the award upon the application of any party to the arbitration:

(a) Where the award was procured by corruption, fraud or undue means;

(b) Where there was evident partiality or corruption on the part of the arbitrators, or either of them;

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced;

Finally, it must be remembered that there is a "strong policy favoring arbitration as a method for settling disputes under collective bargaining agreements." *Milwaukee Professional Firefighters, Local 215 v. Milwaukee,* 78 Wis. 2d 1, 21, 253 N.W.2d 481 (1977). Consistent with that policy, this court has adopted a "hands off" approach to arbitration awards. *Teamsters Local 563,* 75 Wis. 2d at 611.

With these principles in mind, we address the arbitrator's award in this case. Here, the arbitrator held that the Teamsters Union contract, which allowed a group of bus system employees to live anywhere, was a "moderation" of the city residency ordinance. He held that this was especially so in light of the fact that the Teamsters' contract was itself adopted as an ordinance. Hence, his reasoning was that the second ordinance "moderated" the first one.

We cannot say, given the great deference due to an arbitrator's award, that this holding is wrong. It certainly does not rise to the requisite level of a "perverse misconstruction" or "manifest disregard" of the law. There is authority in this state that a later passed ordinance modifies an earlier one. *Compare Ashland Water Co. v. Ashland County,* 87 Wis. 209, 211, 58 N.W. 235 (1894), *and County of Columbia v. Bylewski,* 94 Wis. 2d 153, 169 n. 7, 288 N.W.2d 129 (1980) (the rules for the construction of statutes and municipal ordinances are the same) *with State ex rel Mitchell v. Superior Court of Dane Co.,* 14 Wis. 2d 77,

---

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.

. . .

109 N.W.2d 522 (1961) *and National Exchange Bank of Fond du Lac v. Mann,* 81 Wis. 2d 352, 361, 260 N.W.2d 716 (1978) (citing 2A Sutherland on *Statutory Construction,* sec. 51.02) (when two statutes conflict, later controls). Thus, because there is authority to support the arbitrator's ruling that a later ordinance moderates an earlier one, it must be upheld. *See Local 311 Firefighters,* 131 Wis. 2d at 191 ("An arbitrator cannot be said to have manifestly disregarded the law if substantial authority sustains the arbitrator[] . . . .").

Also in respect to the arbitrator's alleged errors of law, the city argues in its brief that the arbitrator in this case made an error which rises to the requisite level for reversal by this court when he "manifestly disregarded" the effect of UMTA on the original Teamsters' contract. As discussed above, this amounts to an argument that UMTA preempts the Madison residency ordinance, and that, because the city had no choice but to waive residency for the bus system employees under UMTA, it is an error of law to consider this compelled waiver a "moderation" of the residency requirement.

This argument is the identical one which the city raised in *Local 311 Firefighters* and which the court of appeals disposed of there. The court wrote:

> "Respectable authority exists for the proposition that sec. 13(c) of UMTA does not preempt state law. *See Local Div. 589, Etc. v. Comm. of Mass.,* 666 F.2d 618, 627 (1st Cir. 1981) *cert. denied,* 457 U.S. 1117 (state law prevails over sec. 13(c)). *See also Jackson Transit Authority v. Transit Union,* 457 U.S. 15, 27 (1982) *(dicta)* (sec. 13(c) does not supersede state law.)" *Id.* at 191.

Having referred to these same authorities, we agree with this statement of the court of appeals and adopt it as our own.

Further, even if this authority did not exist, we would still reject the city's argument that the arbitrator "manifestly disregarded" the law when he held that the Teamsters' contract waiver of residency cannot trigger the "me too" clause in the MPPOA contract because of the "mandatory" nature of UMTA sec. 13(c). This is because the city's argument rests on the assumption that it was a passive actor in the face of the UMTA provisions. However, the city was always free to reject those funds in the first place. Therefore, even were the city's position correct, and UMTA somehow operated to preempt the residency requirement, the city, in accepting the funds, would have made a choice to accept the waiver of residency that accompanied the funds.

Thus, because the arbitrator's award is due great deference, and because the arbitrator did not base his award on a perverse misconstruction of, or a manifest disregard for, the law, the award must be upheld. Indeed, given the foregoing, it is apparent that the arbitrator not only made an unobjectionable decision, but made a correct one.

The court of appeals, however, found that the arbitrator had exceeded his authority as a matter of law because in *WERC v. Teamsters Local No. 563*, 75 Wis. 2d 602, 250 N.W.2d 696 (1977), this court held that an arbitrator had exceeded his authority in arbitrating whether a nonresident city employee had been dismissed on "just cause," as required by the employee's contract, when the dismissal had been done under authority of a city ordinance requiring

residency. This court said that, because the contract must be considered to have been made with reference to existing law, and because the existing law required residency, the "just cause" provision could not be construed to be a waiver of the residency requirement. *Id.* at 612. The court went on to suggest that, even had the parties intended the terms of the contract to control, such an agreement would have been void, because the parties could not contract to violate a law.

In analyzing *Local 563,* we note, first, that the situation presented differed substantially from that presented here. In that case, the nonresident employee was fired for failing to comply with the residency requirement, and the arbitration was on the issue of whether failing to comply with that requirement constituted "just cause," as required by his contract, for his dismissal. Thus, the conflict between the contract provision ("just cause") and the residency requirement was an oblique one, because it was not clear from the face of the contract whether the "just cause" provision was intended to have any effect on the residency requirement.

By contrast, in this case, the conflict between the residency requirement and the contract is a direct one. The issue which both parties submitted for arbitration was the issue of whether the "me too" clause on the subject of residency controlled over the city ordinance on that same subject. In this sense these cases are very different. Hence, the principles behind *Local 563* can be said to have application only in resolving such implied, or oblique, conflicts and, therefore, is not directly relevant to resolving such direct conflict situations as the one before us here.

■ However, to the extent that *Local 563* can be understood to be laying down a broad rule[8] that, when a contract clause which purports to control residency conflicts with an ordinance which purports to control residency, the ordinance must prevail, that case must be overruled on the grounds of case law which is more on point than *Local 563* and, hence, more persuasive; on the grounds of public policy and logic; and on the grounds of waiver.

Turning first to case law: In *Cayo v. Milwaukee,* 41 Wis. 2d 643, 165 N.W.2d 198 (1969), this court undertook to resolve a dispute over an ordinance which afforded a different treatment to city employee reservists who were veterans as opposed to those who were non-veterans. The court held that there was a rational basis to offer different reserve-period pay scales to the two different groups, but went on to note that if,

> "'... as a result of negotiations between representatives of city employees and the city a certain accord is reached which covers wages, hours, and other conditions of employment, then that contract supersedes any ordinance in conflict with it.'" *Cayo,* 41 Wis. 2d at 651.

---

[8]Under the circumstances presented here, it is apparent that the case must be at least susceptible of such an application, for it is the application which the court of appeals made. That court wrote:

> "While the facts are sufficiently different that the court's statements in *Local 563* might be considered *dicta,* such a conclusion is unwarranted .... We see no grounds for distinguishing *Local 563* ...." *Madison v. Madison Professional Police Officer Association,* 138 Wis. 2d at 364–65.

Thus, the court held that, if the contract negotiated had provided that both veteran and non-veteran reservists had the same pay scales for their reserve duty period, this contract would have controlled over an ordinance which purported to control the same matter.

This seems to us a correct statement of the law in a case where the ordinance being challenged is specific to certain parties, and is the subject of a contract negotiation between those same parties. While it is true, as *Local 563* states, that parties cannot contract to violate a law or ordinance, that rationale is a general statement which has no bearing where, as here, the ordinance is a specific one and is targeted at the exact audience with whom the contract negotiations are undertaken. Instead, that restriction must be limited to situations where the law or ordinance which arguably controls is one which targets a general group, so that it would be against public policy to allow one sub-group, and one sub-group only, to escape operation of the law by means of a contract.[9]

---

[9]This rationale is similar to that which underlies an equal protection analysis. We are cognizant that an argument could be constructed that allowing one group of city employees to avoid the reach of the residency requirement by action of their contract might work an inequity on other groups of city employees who are still bound by the requirement. However, this would not be a denial of equal protection between groups of city employees, because all groups of employees are free to contract, as MPPOA (and the Firefighters) have done, for a "me too" clause in their contracts as well. Further, as the city attorney stated in oral argument, the City of Madison deals with 13 city employee unions on a regular basis, so that the possibility of such denial, even if it existed, could be hypothetical at best.

This principle, as expounded in *Cayo,* may be illustrated using the facts of this case also. The Madison residency ordinance is directed solely at city employees. It requires these employees to live within the city limits at the risk of losing their jobs. However, the city agreed to inclusion of a "me too" clause on the specific subject of residency in the MPPOA contract. This meant the city agreed that, under certain circumstances, the requirements could be waived for the MPPOA members. The ordinance itself contemplated circumstances which would alter or vitiate the ordinance. Thus, the residency ordinance was directed at city employees and the contract terms were also directed at city employees. Under these circumstances, the contract must prevail. Were the situation otherwise, the city could make one representation at the contract table, and another through the common council. No city contract directed at a specific group would long have effect if a city ordinance directed at the same group could overcome it.

We stress, however, that this situation arises only where the groups targeted by the ordinance and the contract are identical.[10] To the extent that *Local 563*

---

In addition, as is further developed *infra,* there is no denial of equal protection between other groups as a result of this holding, because this holding cannot, by its terms, apply where the ordinance targets more than the same narrow group as a contract does (or could) target.

Thus, in the narrow circumstances presented by this case, we explicitly reject the suggestion made in *Local 563* that a holding allowing a contract to control over an ordinance could result in a denial of constitutional equal protection. *Id.* at 612.

[10]It is because this holding is so narrow that no equal protection problem is presented. *See supra,* n. 9.

holds otherwise, it is overruled, but today's holding is not to be understood as a broad exception to the general rule that a law must take precedence over a contract, and that parties cannot avoid the action of a general law or ordinance by contract.

There is another ground also on which we hold that the contract terms here must control over the ordinance. In arbitration, as elsewhere, waiver and estoppel are established doctrines. *Manitowoc v. Manitowoc Police Department,* 70 Wis. 2d 1006, 1020–21, 236 N.W.2d 231 (1975). Here, as stated above, the city agreed to inclusion in the MPPOA contract of a "me too" clause on the specific topic of residency. Because this clause had the effect of agreeing that if the requirement should be waived for one group, this requirement should be waived for the police officers as well, the city was agreeing that the possibility existed that the MPPOA members might have their residency requirement waived. Now the situation has occurred where the city has waived the requirement of residency for others (*e.g.,* for the Teamsters Union under the 24th 13(c) agreement as described above), and the city cannot be heard to complain that the ordinance should take precedence over a clause which the city itself agreed to allow as a waiver or moderation in the MPPOA contract. By agreeing to the "me too" clause, the city has effectively waived its right to rely on the ordinance to the exclusion of the contract.

In sum, we hold that, because of the great deference due to an arbitrator's award, and because there is authority for the holdings made by the arbitrator (*i.e.,* it is not in "manifest disregard" of the law), the award must be reinstated. The arbitrator was not wrong in holding that, because the Teamsters'

contract was adopted by ordinance, this had the effect of "moderating" the residency requirement, so that the MPPOA "me too" clause was triggered; and the arbitrator was correct for the many reasons stated above in rejecting the city's argument concerning the mandatory and preemptive nature of UMTA sec. 13(c). We also hold that, to the extent *Local 563* can be understood to lay down a broad rule that whenever a contract provision contradicts an ordinance provision, the ordinance must without exception control, that case must be overruled. Instead, we set forth a narrow exception to the general rule that parties cannot avoid action of a law or ordinance by contract, which exception applies when, as here, the ordinance and the contract target the identical group. Finally, we hold that, because the City of Madison contemplated waiver of its residency requirement by agreeing to insertion of the "me too" clause in the MPPOA contract in the first place, the city cannot now be heard to argue that, although the clause has been triggered, the ordinance must be exclusively controlling, for such an argument is inconsistent with the very existence of a "me too" clause. The decision of the court of appeals is reversed.

*By the Court.*—Decision reversed.