IN the MATTER OF ARBITRATION BETWEEN: EMPLOYERS INS. OF WAUSAU, a Mutual Company, Petitioner-Respondent,

v.

CERTAIN UNDERWRITERS AT LLOYD'S LONDON, and Certain London Market Insurance Companies, Respondents-Appellants.

Court of Appeals

*No. 95–2930. Submitted on briefs May 6, 1996.—Decided June 4, 1996.*

(Also reported in 552 N.W.2d 420.)

673

On behalf of respondents-appellants, the cause was submitted on the brief of *Robert E. Shumaker* and

*Kristin M. Huotari* of *DeWitt Ross & Stevens S.C.* of Madison, and *Robert A. Knuti* and *Jane H. Veldman* of *Lord, Bissell & Brook* of Chicago, Illinois.

On behalf of petitioner-respondent, the cause was submitted on the brief of *Timothy J. Muldowney* and *Jeffrey J. Kassel* of *LaFollette & Sinykin* of Madison, and *Mark C. Kareken* of *Zelle & Larson LLP* of Minneapolis, Minnesota.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J. Certain underwriters at Lloyd's London and certain London Market insurance companies (Lloyd's) appeal a judgment and an order of the circuit court confirming an arbitration panel's decision awarding Employers Insurance of Wausau (Employers) $7,783,324 under its reinsurance contracts with Lloyd's. Lloyd's argues: (1) the panel exceeded its power by awarding Employers a recovery on contracts which the parties did not submit to arbitration, (2) the panel improperly extended the time the parties had to submit their case and (3) the award must be modified or vacated because it exceeded Lloyd's policy limits.

We conclude: (1) the panel's determination of the scope of the issues submitted derived its essence from the parties' agreement, (2) the arbitration contract empowered the panel to extend the time for the parties to submit their case and (3) the panel had the authority to award an amount greater than the policy limits. Therefore, the judgment and order are affirmed.

## BACKGROUND

Beginning in 1966, Employers and Lloyd's agreed to a series of contracts called "excess retrocessional

676

insurance treaties."[1] Under these treaties, Lloyd's reinsured Employers' reinsurance contracts with other insurance companies. Each of the insurance companies Employers reinsured is called an "original assured."

The treaties each lasted one year, and the parties renewed the treaties on a yearly basis. Employers and Lloyd's structured the contracts in multiple layers of excess of loss coverage through separate contracts with different syndicates of Lloyd's and other insurance companies in the London and United States insurance markets. The separate retrocessional contracts contained common arbitration clauses and common provisions defining "disaster and/or casualty."

Under the treaties, Employers paid the first $200,000 caused by one "disaster and/or casualty." The first-layer retrocessional reinsurer was liable for 95% of the next $800,000, and the second-layer retrocessional reinsurer was liable for 95% of the next $1,000,000. Later, Employers added a third-layer treaty in which the third-layer retrocessional reinsurer paid 95% of the first $500,000 in excess of $2,000,000. A layer of excess coverage is reached only after the lower levels of coverage are exhausted.

---

[1] Generally, a "retrocession" occurs when a reinsurer assumes the reinsurance obligations already assumed by another reinsurer. The concept of reinsurance developed because insurers did not want to turn away potentially large clients, but wanted to avoid the dangers of unexpectedly large, unforeseen liabilities. "Reinsurance" allows an insurer to accept potentially large-risk coverage, but reduce its exposure by reinsuring some part of it. In turn, a reinsurer can reduce its potential risk by reinsuring the reinsurance it has accepted. *Employers Ins. v. Jackson*, 190 Wis. 2d 597, 603 n.2, 527 N.W.2d 681, 682-83 n.2 (1995).

In the 1980s, Employers faced claims on its reinsurance contracts with the original assureds resulting from asbestos-related product liability claims. Employers began to submit requests for reimbursement for its payments under its first-layer retrocessional reinsurance treaties. Employers calculated its reimbursement request by aggregating all asbestos-related losses sustained by each original assured during a policy period. Lloyd's rejected Employers' request for reimbursement on the grounds that the policies did not allow Employers to aggregate the losses in this manner. Lloyd's argued that each claim from each individual injured by asbestos was a separate "disaster and/or casualty." No individual loss exceeded the first-layer contracts' retention of $200,000 per occurrence, so Lloyd's denied Employers reimbursement under the first-layer contracts.

In a letter dated May 27, 1991, Employers demanded arbitration regarding the denial of reimbursement. Employers' demand referenced seven first-layer policies by policy number in the caption of the letter. The parties completed selection of the arbitration panel on May 22, 1995.[2] The arbitration clause

---

[2] Article XVII of the treaties provides:

If any dispute or difference of opinion shall arise with reference to the interpretation of this Agreement or the rights with respect to any transaction involved, the dispute shall be referred to three arbitrators, who shall be executive officers of insurance companies domiciled in the U.S.A., one to be chosen by the Company, one to be chosen by the Retrocessionare, and the third by the two arbitrators so chosen within 30 days of their appointment. *If either party refuses or neglects to appoint an arbitrator within 30 days after the receipt of written notice from the other party requesting it to do so, the requesting party may nominate two arbitrators, who shall choose the third.* Each party shall submit its case to the arbitrators within 30 days of the appointment of the arbitrators. The arbitrators shall consider this Agreement an honorable engagement

requires each party to "submit its case to the arbitrators" within thirty days of the selection of the panel. At the end of the thirty-day period, Employers submitted a statement of its case, but requested further discovery.

Lloyd's objected to the arbitrators deciding any dispute under any policies other than the seven referenced by policy number in the arbitration demand letter, and objected to any discovery or submission being made to the arbitrators after the thirty-day period. The panel overruled these objections and determined that the scope of the arbitration included claims against the signatories to all treaties between July 1, 1966, and June 30, 1973, and stated that it may request further submissions from the parties. The parties entered into a total of sixteen treaties between July 1, 1966, and June 30, 1973. Other facts are set forth in the discussion of the separate issues raised on appeal.

After reviewing the parties' submissions, the panel decided that Employers could aggregate the asbestos claims for each original assured as one disaster,

---

rather than merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law. The decision of a majority of the arbitrators shall be final and binding on both parties. The expense of the arbitrators and of the arbitration shall be equally divided between each party. Any such arbitration shall take place in Wausau, Wisconsin, unless some other location is mutually agreed upon. (Emphasis added.)

Lloyd's failed to name an arbitrator within 30 days of Employers' written request for arbitration. Lloyd's argued that Employers' initial request for arbitration did not give it notice because the request was sent to its law firm in Chicago, not to its London broker. In *Employers Ins. v. Jackson*, 190 Wis. 2d 597, 527 N.W.2d 681 (1995), our supreme court rejected Lloyd's argument and allowed Employers to choose two of the arbitrators.

awarded Employers $7,783,324 and released Lloyd's from further liability under the contracts. Employers moved the circuit court to confirm the arbitration award and Lloyd's countermoved to vacate or modify the award. The circuit court confirmed the award in its entirety. Lloyd's does not challenge the decision that the claims could be aggregated, but challenges the scope of arbitration, the panel's decision to allow submissions more than thirty days after the selection of the panel, and the amount of the award.

## SCOPE OF ARBITRATION

Lloyd's does not dispute that the arbitration clause in the treaties encompasses the aggregation dispute. However, an arbitration provision "constitutes merely a promise to arbitrate." *John Morrell & Co. v. Local Union 304A*, 913 F.2d 544, 561 (8th Cir. 1990). How the parties framed the issue to be arbitrated, the conduct of the parties, and the original contract to arbitrate, determine the scope of the arbitrator's authority. *Id.*

Lloyd's argues that the parties submitted a request for arbitration regarding only the seven reinsurance treaties and that the panel exceeded its authority by imposing liability on policies not specifically referenced by policy number in Employers' arbitration request. If the panel exceeded its power, we must modify or vacate the award. *See* §§ 788.10(1)(d) and 788.11, STATS.[3] Employers responds that the issue presented to the panel was whether Employers could

---

[3] Section 788.10(1), STATS., provides:

(1) In either of the following cases the court in and for the county wherein the award was made must make an order vacating the award upon the application of any party to the arbitration:

aggregate all the claims related to asbestos for each original assured, and that the resolution of this issue determined the amount it could collect from of its reinsurance contracts for all years and all layers from July 1966 to June 1973. The panel agreed with Employers.

An issue falls within the scope of the issues presented to the arbitrator if a common intent to submit that particular issue appears with reasonable certainty. *See Milwaukee Prof. Firefighters Local 215 v. City of Milwaukee*, 78 Wis. 2d 1, 16, 253 N.W.2d 481, 489 (1977). In our case, unlike *Milwaukee Prof. Firefighters*, the parties raised the issue of the scope of

(a) Where the award was procured by corruption, fraud or undue means;

(b) Where there was evident partiality or corruption on the part of the arbitrators, or either of them;

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced;

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.

Section 788.11(1), STATS., provides:

In either of the following cases the court in and for the county wherein the award was made must make an order modifying or correcting the award upon the application of any party to the party:

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing or property referred to in the award;

(b) Where the arbitrators have awarded upon a matter not submitted to them unless it is a matter not affecting the merits of the decision upon the matters submitted;

(c) Where the award is imperfect in matter of firm not affecting the merits of the controversy.

the submission to the panel, and it ruled on that issue.[4] Federal circuit courts have consistently reviewed an arbitrator's interpretation of the scope of the issues submitted under the same standard as they review an arbitrator's interpretation of a contract. *Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 285 (9th Cir. 1989). Appellate courts uphold an arbitrator's contract interpretation if the arbitrator's interpretation drew its essence from the contract so it was not a manifest disregard of the parties' agreement. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960). This standard fosters recourse to arbitration for dispute resolution and forecloses the possibility that our courts will become flooded with disputes involving the exact scope of arbitration proceedings. *See Department of Public Safety v. Public Safety Employees Ass'n*, 732 P.2d 1090, 1097 (Alaska 1987).

██

We conclude that the panel's decision to include all policies affected by the aggregation issue derived its essence from the request for arbitration and did not show a manifest disregard for the agreement between the parties. In Employers' May 27, 1991, request for arbitration, it noted that "one panel must determine any basis for the consolidated, common denial and assess the conduct surrounding that denial, as well as the damages flowing from it." Employers also noted "[t]his request involves all existing and future asbestos claims affected by [Lloyd's] denial."

---

[4] Review of the scope of the issue submitted to an arbitrator is not to be confused with review of whether the contractual arbitration clause encompasses a dispute, i.e., the arbitrability of the dispute. *See Joint School Dist. No. 10 v. Jefferson Ed. Ass'n*, 78 Wis. 2d 94, 106-10, 253 N.W.2d 536, 542-44 (1977).

The parties' conduct leading up to the request for arbitration strengthens the inference that the request related to every treaty affected by the aggregation issue. Employers requested Lloyd's to explain whether its denial of coverage "was intended as a blanket denial of all presently existing and future asbestos-related claims." Lloyd's responded "[i]n response to your inquiry the denial of the London Reinsurers is intended to apply to all of [Employers] reimbursement requests for its bodily injury asbestos-related losses involving the July 1, 1966 to June 30, 1973 treaties." Further, no language in any of the correspondence explicitly states that the arbitration request pertains only to the seven policies Employers listed in its caption.

Lloyd's notes the caption of the letter lists seven specific insurance policies by number. Lloyd's also presents other evidence indicating the parties intended the submission for arbitration to only refer to seven policies. We note that Employers' statement of its case showed it had only submitted reimbursement claims under the seven first-layer policies contained in the caption of the demand for arbitration, and four second-layer policies. At best, these facts make the parties' intent ambiguous. Our standard of review requires us to defer to the panel's choice in such a case. *See Enterprise*, 363 U.S. at 599.

Lloyd's argues that the panel lacked the power to consolidate the arbitration for all of the policies. Lloyd's cites federal decisions that hold that neither a district court nor an arbitrator has the power to consolidate claims under separate arbitration contracts absent an agreement to do so, even if consolidation would more efficiently resolve all the claims. *See United Kingdom v. Boeing Co.*, 998 F.2d 68, 69 (2d Cir. 1993). Lloyd's analogizes our case to *North River Ins.*

*Co. v. Philadelphia Reins. Corp.*, 856 F. Supp. 850 (S.D.N.Y. 1994), *rev'd on other grounds*, 63 F.3d 160 (2d Cir. 1995), in which the district court, relying on *Boeing*, rejected the argument that various reinsurers were deemed to consent to a consolidated arbitration by virtue of signing the same reinsurance treaty with an arbitration clause similar to the one in our case.

In *North River*, the court ordered consolidation without an alleged agreement of the parties to do so. In our case, the panel concluded that the parties' conduct and the way they framed the issue to be arbitrated evinced an agreement to consolidate the arbitration. *See John Morrell*, 913 F.2d at 561. *Boeing* allows consolidation of separate arbitration claims if the parties agree to do so. *Id.* at 69. Because the panel found an implicit agreement, we reject Lloyd's argument.

## EXTENSION OF TIME FOR SUBMISSIONS

Next, Lloyd's argues that the panel exceeded its power by allowing Employers to present evidence after thirty days of the arbitrators' appointment. The arbitration clause in the treaties require each party to "submit its case" to the arbitrators within thirty days from the arbitrators' appointment. On May 22, 1995, the parties completed selection of the panel. On June 21, 1995, Employers submitted a statement of the case and some exhibits. The statement of the case provided a factual history of the dispute, legal argument, and a request for further discovery. Lloyd's objected to any further discovery or submissions. The panel decided to allow further discovery, but only to the extent the panel requested. Employers thereafter presented statements from expert witnesses, affidavits and exhibits. The trial court held that this was merely a procedural mat-

ter within the arbitrators' discretionary powers to conduct the proceedings.

■

The phrase "submit its case" is ambiguous. A contractual phrase is ambiguous if it can reasonably be understood in more than one sense or can convey more than one meaning. *DOT v. Transportation Comm'n*, 111 Wis. 2d 80, 87, 330 N.W.2d 159, 162 (1983). One could reasonably interpret the phrase to mean that the parties must present all facts and all argument within thirty days of the selection of the panel. However, one could also reasonably interpret the phrase to mean that the parties must only introduce their argument within thirty days. The latter interpretation gives the panel discretion to continue fact-finding and discovery if it needs to do so to reach a proper resolution of the case.[5]

---

[5] Lloyd's argues that "submit" unambiguously means placing an issue before a court for final determination, citing *MacDermot v. Grant*, 184 P. 396-97 (Cal. 1919); *State v. Kitchin*, 282 S.W.2d 1, 3 (Mo. 1955), citing 83 C.J.S. *Submission* 557; and *Moore v. Moore*, 240 S.E.2d 535, 538 (Va. 1978). These cases define "submit" in contexts distinguishable from our case and do not persuade us that "submit" as it appears in the treaties unambiguously requires the parties to complete placing their case before the panel. For instance, 83 C.J.S. SUBMISSIONS OF CONTROVERSY 559 (1953), describes "submission of a controversy" as

> a procedure whereby the parties, without instituting an action, submit to any court that would otherwise have jurisdiction . . . any matter of real controversy between them for final determination . . . *on any agreed statement of facts.* . . . (Emphasis added; footnote omitted.)

This definition of "submit" assumes the parties have agreed upon the facts and thus the court would not need to hear any

The arbitration clause states that the panel is "relieved of all judicial formalities and may abstain from following the strict rules of law." Given the broad power the clause gives to the panel in controlling procedure, we will defer to its interpretation of an ambiguous phrase regulating procedure. *In re Arbitration between West Salem & Fortney*, 108 Wis. 2d 167, 177-78, 321 N.W.2d 225, 232 (1982).

> Because the language in the agreement is vague and indefinite as to exactly what procedures should be used to arrive at that determination, it is within the province of the arbitration panel, as the interpreter of the contract language, to devise such procedures as it considers necessary to reach a decision, as long as those procedures are compatible with the contract language and do not violate the law.

*Id.* We conclude that the arbitration agreement authorized the panel to extend the period for fact finding and discovery beyond thirty days after its selection.

## AMOUNT OF AWARD

The policy limit for all policies involved is $5,203,507. The panel awarded Employers $7,783,324 plus costs, postaward interest and a letter of credit for the syndicates and insurance companies that did not pay their share of the award within forty-five days.

In its decision, the panel did not specify its basis for exceeding the policy limits. The panel's lack of legal analysis is not a basis to vacate or modify an award. *See*

---

evidence or keep discovery open. In our case, by contrast, one of the panel's functions was to find facts.

*McKenzie v. Warmka*, 81 Wis. 2d 591, 601, 260 N.W.2d 752, 757 (1978). We provide only a limited review of arbitrators' awards because parties who contract for arbitration are entitled to an arbitration award without having to relitigate the issues in court. *City of Madison v. Madison Prof. Police Officers Ass'n*, 144 Wis. 2d 576, 585-86, 425 N.W.2d 8, 11 (1988). We may not substitute our judgment for that of the panel whether the award is correct or incorrect as a matter of fact or law. *Milwaukee Teachers' Ed. Ass'n v. Milwaukee Bd. of Sch. Dirs.*, 147 Wis. 2d 791, 795, 433 N.W.2d 669, 671 (Ct. App. 1988). However, we will vacate or modify the arbitrators' award if "perverse misconstruction or positive misconduct [is] plainly established, or if there is a manifest disregard of the law, or if the award itself is illegal or violates strong public policy." *Madison Police Ass'n*, 144 Wis. 2d at 586, 425 N.W.2d at 11 (quoting *Milwaukee Bd. of Sch. Dirs. v. Milwaukee Teachers' Ed. Ass'n*, 93 Wis. 2d 415, 422, 287 N.W.2d 131, 135 (1980)). These narrow grounds for overturning an arbitrator's award are codified in §§ 788.10(1) and 788.11(1), STATS. *See* note 3. The scope of our review of the arbitrator's decision is the same as the circuit court's and we give no deference to the circuit court's decision. *City of Madison v. Local 311, Int'l Ass'n of Firefighters*, 133 Wis. 2d 186, 190, 394 N.W.2d 766, 768 (Ct. App. 1986).

Lloyd's argues that the award over the policy limits cannot represent preaward interest and is a manifest disregard of the law.[6] It refers to Wisconsin

---

[6] Lloyd's also contends that the panel would have manifestly disregarded the law if it had awarded punitive damages. *See Autumn Grove Joint Venture v. Rachlin*, 138 Wis. 2d 273, 280, 405 N.W.2d 759, 762-63 (Ct. App. 1987) (Wisconsin does not allow punitive damages in breach of contract actions.). We

law that requires claims to be liquidated or "determinable" for prejudgment interest to accrue and sets the prejudgment interest rate at 5% when there is no agreement or statute to the contrary. *Benke v. Mukwonago-Vernon Mut. Ins. Co.*, 110 Wis. 2d 356, 366-69, 329 N.W.2d 243, 249-50 (Ct. App. 1982). Lloyd's argues that, applying a 5% interest rate, the interest would have had to start accruing around 1985 for the interest to equal the excess amount. Lloyd's concludes that the claims could not have been liquidated or determinable in 1985 because Employers first submitted reinsurance billings in 1986.

We reject Employers' first response that Lloyd's challenge to the amount of the award is moot. Employers suggests that the difference between the award and the policy limits constitutes interest and costs expressly awarded which the parties to the appeal in fact did not have to pay. Employers claims that the parties to the appeal did not have to pay postaward costs or interest either because payment was made within forty-five days or, alternatively, late payments

---

do not address this issue because we conclude that the excess of the award over the policy limits could represent prejudgment interest. However, we note that Wisconsin law on punitive damages does not control because the arbitration agreement does not contain a choice of law clause. We also note that the widely used American Arbitration Association rules have been interpreted by a number of courts to allow arbitrators discretion to award punitive damages. Kenneth R. Davis, *A Proposed Framework for Reviewing Punitive Damages Awards of Commercial Arbitrators*, 58 ALB. L. REV. 55, 64-65 (1994). Finally, some jurisdictions permit punitive damages in arbitration awards unless the arbitration agreement contains an express prohibition. *Id.* at 64.

were forgiven.[7] However, the interest the appellants avoided by making a timely payment related to post-award interest on the $7.8 million, not to preaward interest.

Employers next responds that Wisconsin does not permit vacatur of an arbitration award on manifest disregard of the law basis because that common law ground is not encompassed by § 788.10, STATS. Employers bases its argument on *DeBaker v. Shah*, 194 Wis. 2d 104, 112, 533 N.W.2d 464, 466 (1995), stating that "[a]n arbitration award will *only* be set aside where one of the grounds for vacatur under sec. 788.10(1), STATS., [is] present." (Emphasis added.) Although the trial court accepted this argument, we reject it. *Lukowski v. Dankert*, 184 Wis. 2d 142, 150, 515 N.W.2d 883, 886 (1994), held that we are "guided by the general statutory standards listed in secs. 788.10 and 788.11, STATS., and by the standards developed at common law." (Footnote and citations omitted.) Further, our supreme court noted that § 788.10 echoes the common law standards, implying that if an arbitrator manifestly disregarded the law, the arbitrator exceeded the scope of his powers, requiring vacatur under § 788.10(1)(d), STATS. *Madison Police Ass'n*, 144 Wis. 2d at 586, 425 N.W.2d at 11. We conclude that *DeBaker* did not intend to overrule *Lukowski*, and the cases cited therein, absent a more direct signal.

Nonetheless, we reject Lloyd's argument that the award must be vacated or modified because it represents a manifest disregard of Wisconsin's prejudgment interest laws. The appellant insurance companies are variously domiciled in the United States, England, France, Switzerland, Portugal, Italy, Brazil, Scotland,

[7] Not all of the parties to the arbitration took part in the appeal to this court.

Turkey, Japan and Germany. *Employers Ins. v. Jackson*, 190 Wis. 2d 597, 602 n.1, 527 N.W.2d 681, 682 n.1 (1995). The arbitration clause does not require the panel to apply Wisconsin law. Lloyd's cites *Milwaukee Teachers' Ass'n*, where we affirmed the order vacating an arbitration award because the award did not abide by the principles of Wisconsin law. In *Milwaukee Teachers' Ass'n*, the collective bargaining agreement provided that the arbitrator "shall be bound by the principles of law relating to the interpretation of contracts followed by Wisconsin courts." *Id.* at 796, 433 N.W.2d at 671. No similar clause is found in the agreement here.[8]

---

[8] The arbitration clause in this case does provide the panel is "relieved of all judicial formalities and may abstain from following the strict rules of law." Even if Wisconsin law were applied, an argument could be made that the common law limit of 5% interest and its application only to liquidated or determinable damages fall within the panel's right to "abstain from following the strict rules of law." There is an ongoing debate whether this Wisconsin common law is equitable or should be changed. *See, e.g. Nelson v. Travelers Ins. Co.*, 102 Wis. 2d 159, 169, 306 N.W.2d 71, 76 (1981): "We are no longer firmly convinced that only the unliquidated or unliquidable character of damages should determine whether interest is payable on the amount due."

Under American law, clauses relieving arbitrators of any obligation to follow strict rules of law are permitted provided the hearing is fair. *See* Jonathan Bank & Patricia Winters, *Reinsurance Arbitration: A U.S. Perspective*, in LAW & PRAC. OF INT'L REINSURANCE COLLECTIONS & INSOLVENCY 553, 576-77 (David M. Spector & John Milligan-Whyte eds. 1988). Under English law, which Lloyd's argued applied at the final hearing before the panel, a clause relieving an arbitrator from following the "strict rules of law" entitles the arbitrator to interpret the meaning of the reinsurance contract with regard more generally

Wisconsin uses a "groupings of contacts" test to determine choice of law.[9] *Heath v. Zellmer*, 35 Wis. 2d 578, 596, 151 N.W.2d 664, 672 (1967). Under that doctrine, the choice of law is based on the "Predictability of results[;] Maintenance of interstate and international order[;] Simplification of the judicial task[;] Advancement of the forum's governmental interest[; and] Application of the better rule of law." *Id.* Assumably, the asbestos claims originated throughout the United States and the parties to this case are domiciled throughout the world. Our supreme court has questioned our restrictive prejudgment interest rules, and commentators have criticized these rules in general, so Wisconsin's prejudgment interest rules are not necessarily the "better rule of law." *See, e.g., Nelson v. Travelers Ins. Co.*, 102 Wis. 2d 159, 169, 306 N.W.2d 71, 76 (1981); *see, e.g.*, Anthony E. Rothschild, Comment, *Prejudgment Interest: Survey & Suggestion*, 77 Nw. U. L. Rev. 192, 197 (1982). The panel could have applied the grouping of contacts doctrine to use the substantive law of a number of other jurisdictions without manifestly disregarding the law.

In fact, in its presentation to the panel, Lloyd's argued that the panel should apply English law and recognized that the panel might apply "the law of any state of the United States . . . ." We do not mean to imply that the panel applied English law; rather, these

to commercial considerations than would be permissible in a court of law. *Home v. Mentor*, 1 Lloyd's Rep. 473 (1989).

[9] An argument could also be made that the arbitration clause gives the panel flexibility to use a choice of law test other than the one used at the venue of arbitration (Wisconsin). Further, the clause does not necessarily bind the panel to exclusively use the law of a single jurisdiction.

comments illustrate that Lloyd's also recognized it would be reasonable for the panel to apply the law of a jurisdiction other than Wisconsin.

█

Other jurisdictions do not limit prejudgment interest in the same manner Wisconsin does.[10] Lloyd's fails to overcome the presumption of validity of the arbitrator's award because it did not demonstrate by clear and convincing evidence that the award was invalid. *See Milwaukee Sch. Dirs.*, 93 Wis. 2d at 422, 287 N.W.2d at 135. We will not overturn the amount of the award of prejudgment interest.

## CONCLUSION

The panel's determination that the parties intended to resolve the aggregation issue relating to all treaties from July 1966 to June 1973 derived its essence from the submission of the parties and did not show a manifest disregard of the law. Further, we conclude that the parties authorized the panel to allow Employers to present facts more than thirty days after the selection of the panel. Finally, the arbitration clause granted the panel the authority to award an amount in excess of the policy limits.

---

[10] Many jurisdictions' statutory prejudgment interest rates are greater than 5%. *See* Robert J. Sergesketter, *Interesting Inequities: Bringing Symmetry & Certainty to Prejudgment Interest Law in Texas*, 32 HOUS. L. REV. 231, 250-51 (Summer 1995). Further, jurisdictions are split regarding whether damages must be determinable before prejudgment interest can accrue. *See* Anthony E. Rothschild, Comment, *Prejudgment Interest: Survey and Suggestion*, 77 NW. U. L. REV. 192, 199 (1982).

*By the Court.*—Judgment and order affirmed.