Dawn M. SANDS, Plaintiff-Respondent,

v.

MENARD, INC., Defendant-Appellant-Petitioner.†

Supreme Court

No. 2008AP1703. *Oral argument January 5, 2010.*
*—Decided July 21, 2010.*

2010 WI 96

(Also reported in 787 N.W.2d 384.)

† Supreme Court Motion for Reconsideration Pending.

For the defendant-appellant-petitioner there were briefs by *Beth Ermatinger Hanan, Shawn K. Stevens,* and *Gass Weber Mullins LLC,* Milwaukee, and *Webster A. Hart, Terry L. Moore,* and *Herrick & Hart, S.C.,* Eau Claire, and oral argument by *Beth Ermatinger Hanan.*

For the plaintiff-respondent *Charles K. Maier, Daniel R. Shulman, Julie L. Boehmke, Jeremy L. Johnson,* and *Gray Plant Mooty Mooty & Bennett, P.A.,* Minneapolis, Minn., and *John P. Richie* and *Richie Wickstrom and Wachs, LLP,* Eau Claire, and oral argument by *Daniel R. Shulman.*

An amicus curiae brief filed by *William F. Bauer* and *Coyne, Schultz, Becker & Bauer, S.C.,* Madison, and *Byron F. Egan* and *Jackson Walker L.L.P.,* Dallas, Tex., on behalf of Byron F. Egan, Pro Hac Vice.

¶ 1. MICHAEL J. GABLEMAN, J. This is a review of a published decision of the court of appeals[1] affirming an arbitration award that, among other things, ordered Dawn Sands' reinstatement to her position as Vice

[1] *Sands v. Menard,* 2009 WI App 70, 318 Wis. 2d 206, 767 N.W.2d 332.

President and Executive General Counsel following her wrongful termination from Menard, Inc. ("Menard"). Menard has refused to reinstate Sands and challenges the reinstatement award on multiple grounds. The root of Menard's challenge is that the attorney-client relationship between Menard and Sands has been so irretrievably damaged that the panel exceeded its authority by ordering reinstatement.

¶ 2. We agree with Menard that the panel exceeded its authority. An arbitration panel exceeds its authority when its award violates strong public policy. An attorney owes a fiduciary duty of loyalty to her clients, a duty so replete in our cases and in the Rules of Professional Conduct as to be axiomatic. Such a duty is deeply rooted in our laws and embodies the strong public policy of the State of Wisconsin. In this case, we conclude that by accepting reinstatement, Sands would be forced to violate her ethical obligations as an attorney. Thus, we vacate the panel's award of reinstatement on the grounds that it is void as a violation of strong public policy. Under the applicable employment discrimination laws, front pay is a substitute for reinstatement. Accordingly, we vacate the panel's award of reinstatement and remand to the circuit court to determine an appropriate award of front pay.

## I. BACKGROUND

¶ 3. Dawn Sands is a 1993 graduate of the William Mitchell College of Law. In 1998, John Menard,[2] founder and president of Menard, approached Sands, the sister of his then-girlfriend Debra Sands, about

[2] This opinion will refer to Menard, Inc. as "Menard." When referring to John Menard or Charlie Menard, we will use their full names.

working for Menard's legal department. John Menard told Sands he was dissatisfied with the performance of the legal department in general, and of David Coriden, Vice President and General Counsel, specifically.

## A. Sands' Tenure at Menard

¶ 4. On June 1, 1999, Sands began working in a newly-created position at the corporate legal office of Menard. John Menard asked Sands to assess and oversee the in-house legal department,[3] including Coriden, and to create a title that reflected this oversight. Sands adopted the title of Executive General Counsel. In addition to her legal duties, Sands operated as the spokesperson for Menard, handling inquiries from the media and generally acting as a public representative for the company.

¶ 5. Based on her pre-hire discussions and agreement with John Menard, Sands expected to begin working at Menard with a salary of $56,000 per year. On her first day at Menard, Sands learned that she was required to punch a clock and would be paid by the hour at a rate of $26.92 ($55,993.60 annually, plus overtime). With this hourly rate, Sands could earn up to $40.38 per hour for overtime (at time-and-a-half) and an additional $2.50 per hour for weekend hours worked.

¶ 6. On August 17, 1999, just months after Sands began working at Menard, Coriden was terminated following a disagreement with John Menard. Sands then assumed all of Coriden's duties while continuing to

[3] Menard's in-house legal department consisted of a corporate legal practice, real estate practice, and store counsel practice. The record reflects that Sands oversaw a staff of somewhere between 11 and 17 attorneys during her tenure, plus paralegal and administrative support staff.

oversee Menard's in-house legal department. At the time of his termination, Coriden was paid a yearly salary of $104,999.96, plus a bonus. Shortly after Coriden's termination, John Menard told Sands, "[I]f you are here in a year, wouldn't you like to be making over a hundred thousand? If you are you will be."

¶ 7. In June 2001, after working for Menard for two years without any pay increases, Sands made verbal and written requests to John Menard to raise her salary to $70,000 per year. Menard responded by increasing her wage to $30.92 per hour (a $4.00 per hour raise), or $64,313.60 per year without overtime, effective July 29, 2001.

¶ 8. Over the next several years, Sands made repeated requests to John Menard for a pay raise. In one written request dated November 24, 2004, Sands requested a pay increase to $56.59 per hour, the equivalent of $117,707 per year. The memo explained that this proposed figure was based on Coriden's salary at the time of his termination in 1999, plus cost of living increases he would have received were he still employed at Menard. In the memo, Sands stated that she was "doing at least an equal level of work" as Coriden had done. Sands never received a second pay increase.

¶ 9. On March 18, 2005, Sands received an e-mail from Chief Operating Officer Charlie Menard stating that she was eligible for a bonus to be paid in 2006 if she signed an employment agreement and was evaluated by the "9–Block" evaluation system.[4] In late 2005, evalua-

---

[4] In the "9–Block" evaluation system used at Menard, employees are scored based on "Menard Values" and job performance. For the "Menard Values" portion, subordinates, peers, and managers are asked to evaluate the employee on characteristics including "team player, innovation, team member devel-

tion surveys on Sands were completed, but Sands never received the results or final report due to her termination.[5]

## B. Sands' Termination

¶ 10. On January 11, 2006, Sands received an e-mail from Jessica Bierman of the corporate human resources office advising that Charlie Menard wanted a job description to include with a new compensation agreement. Several e-mails were exchanged between Sands, Charlie Menard, and Bierman, including an e-mail from Sands to Charlie Menard dated January 20, 2006, which stated, "Not only do I WANT to get paid more, but, in point of fact, I MUST be paid more (in both cash as well as bonus) if you intend to avoid a lawsuit."

¶ 11. In a meeting on that same day, Sands provided Bierman a binder that included a job description, a comparison of compensation packages with other high-level private sector executives around the country and her male comparators within Menard, a copy of Sands' November 24, 2004, memo to John Menard requesting a pay raise, and an Equal Employment Opportunity Commission Publication entitled "Facts About Compensation Discrimination." During the meeting, which lasted approximately 90 minutes, Sands reviewed the binder with Bierman. Sands stated that she believed she had grounds for a lawsuit because she was not receiving pay equal to Coriden or other top

opment, guest focus, leadership, integrity, passion for excellence, problem solving, and courtesy."

[5] The record does not indicate the results of these surveys or give any indication as to the general quality of Sands' work.

executives within Menard, including the chief informa-
tion officer and the chief financial officer, all of whom
were men.[6]

¶ 12. After her meeting with Sands, Bierman gave
the binder to Charlie Menard and told him about their
meeting. Later that afternoon, Charlie Menard ap-
proached Sands and asked, "[H]ow dare you threaten a
Menard?" Sands responded that she was not trying to
threaten the company; she was "just trying to point out
a legal reality" and explained that she believed she had
a valid legal claim against Menard.

¶ 13. A little over six weeks later, on Monday,
March 6, 2006, Charlie Menard entered Sands' office
with a proposed employment contract. The contract
included a wage of $30.92 per hour and an unspecified
bonus to be paid in March and July of 2007. Sands told
Charlie Menard that this was the same wage she had
received for approximately five years. Charlie Menard
then wrote "$50,029.98" on a Post-it note and affixed it
to the second page of the contract, stating that this was
the bonus she would receive if she continued to work for
Menard for another year. Sands responded, "I've been
sitting here working my butt off and I get nothing. I just
get all these promises . . . . [W]hat is that, just a big lie
to make me keep working?" Charlie Menard shrugged
and said, "Worked, didn't it?" Sands replied that as a
43–year-old woman with no one else to rely on, she
needed to be concerned about her retirement. Charlie
Menard responded, "[W]hy don't you get married like
every other girl?" Sands countered, "Charlie, you under-
stand there is a law called the Equal Pay Act?" Charlie

---

[6] From 2003 to 2006, Sands made the following amounts as
stated on her W-2 forms: $77,092 in 2003 and 2004; $81,177 in
2005; and $29,372 in 2006 (from January 1 until her termina-
tion on March 14).

Menard then told Sands that she would be unsuccessful at Menard if she continued to threaten the company with lawsuits, and asked if she was planning to sign the contract. Sands replied that she did not know and was going to think about it.

¶ 14. On Thursday and Friday of that week (March 9 and 10, 2006), Sands went to Chicago on business for Menard. The following Monday, March 13, 2006, Sands returned to the office and found a memo from Charlie Menard dated Thursday, March 9, 2006, in her in-box. In the memo, Charlie Menard communicated his belief that Sands was not likely to accept the proposed contract, that an agreement on compensation might not be possible, and that she should suggest some ways to professionally dissolve their relationship.[7] Sands viewed this as a threat to her job and did not immediately respond. Later that evening, Charlie Menard sent a follow-up e-mail to Sands, requesting that she respond to the memo. Sands replied that she would work on his request and get back to him.

¶ 15. According to the arbitration panel, on the evening of Tuesday, March 14, 2006, Sands was preparing for a meeting in her office when John Menard

---

[7] The memo from Charlie Menard to Sands read as follows:

I came away from our meeting on Monday with the feeling that my offer of additional compensation for you was not acceptable to you.

I would like to get this rectified with you and, to that end, please advise me with what you feel would be fair.

I also came away with the feeling that there is a possibility that we can not come together on the issues. I would like your advice on how we can professionally dissolve our relationship and what you feel might be a proposed timetable for doing so.

If you could please jot down your thoughts on these subjects and send them to me at your earliest convenience, it would be appreciated.

stepped in. "This isn't working, is it," he said. "I'm sick to death of your not getting back to Charlie and you don't respond and your threats." John Menard then instructed Sands to work out an agreement with Charlie Menard by the end of business the next day or she would be "all done." Then he left her office.

¶ 16. Moments later, John Menard returned and declared, "[Y]ou know what, you're all done right now. Pick your shit up; I want your ass out of here. You've got five minutes." Sands asked if he was firing her. John Menard stated that he was placing her on administrative leave. Sands asked for a clarification and stated that Menard did not have an administrative leave policy. John Menard repeated that Sands was on administrative leave, that she had better get moving, and that she now had only four minutes. "[D]o you understand what you're doing right now is unlawful?" Sands asked. "I don't care," John Menard replied. "I want your ass out of here."

¶ 17. At some point during this encounter, Sands turned to her computer in an attempt to log off. John Menard saw this, approached her from the other side of her desk with his hand in a fist, and ordered her to get away from the computer. He then continued to tell Sands to get "[her] ass out of there" and that he wanted "[her] ass gone." Sands collected a few personal items, and left with John Menard following her out of the building.

¶ 18. Sands later testified that during this incident, she felt "intimidat[ed]" by John Menard, who seemed "out of control"; she further testified that she was "scared," "humiliated," and "so embarrassed" by these events. The following day, John Menard had Sands' office door secured with a chain and padlock, which was removed a few days later when the lock was changed.

¶ 19. Unsure of her status, Sands had her attorney send a letter to Menard on March 20, 2006, to

confirm that she had been terminated and not placed on administrative leave, as John Menard had stated. Sands received no response to this letter. During the ensuing weeks, Sands received a notice terminating her health insurance through Menard, along with other documents confirming she had been terminated. Sands returned to Menard on April 21, 2006, to pick up the remainder of her personal belongings. When she entered her former office, she found papers and books strewn everywhere, and furniture upturned. Within months of Sands' termination, three other employees left the corporate legal department. In their exit interviews with Jessica Bierman, all three stated that the main reason they were leaving was because of how Sands had been treated.

## C. Arbitration and Award

¶ 20. After her termination, Sands maintained that she had been defamed by Menard and was the victim of gender-based discrimination and then retaliation for claiming discrimination. Sands and Menard initially attempted to settle their dispute independently. Among their efforts was a private meeting between Sands and John Menard in May 2006 that ultimately proved unsuccessful. On October 23, 2006, Sands and Menard mutually agreed to enter into binding arbitration.[8]

¶ 21. The arbitration agreement bound both parties to resolve "all disputes" arising from Sands' employment with Menard. The agreement further provided

---

[8] Around October 31, 2006, Sands was offered a job at the law firm of McDermott, Will & Emery with a starting salary of $250,000. Sands declined the offer because "she was reluctant to start in private practice in one area."

"that both state and federal laws may apply and that Sands may be entitled to remedies under both." The agreement also required Sands to identify "the nature of relief sought."

¶ 22. During the arbitration hearings, Sands testified regarding her role and work at Menard and her concerns about the discrepancy in pay between herself, her predecessor, and other male executives at Menard. She also described the circumstances leading up to and including her termination. The panel determined that various Menard representatives attempted to influence witnesses during the arbitration proceedings. The panel described one instance when John Menard called Debra Sands, Sands' sister, and stated, as Debra Sands recalled it, that "he did not want to talk about the case, but he wanted to tell me that I should seriously think about what I was doing and that he would hate to see my obituary in the paper anytime soon."

¶ 23. During the arbitration hearings, Sands did not request to be reinstated to her position at Menard, but instead sought two years of front pay. In fact, in a brief to the arbitration panel, Sands stated that "no reasonable person would entertain reinstatement as a possibility" in these circumstances. Sands also argued that reinstatement would be inappropriate in light of John Menard and Menard's conduct towards her.

¶ 24. On October 19, 2007, the arbitration panel came back with its written award. While it rejected Sands' defamation[9] and Title VII pay discrimination claims,[10] the panel found that Sands (1) was the victim

_____

[9] Sands' defamation claims were based on various communications during and after her termination.

[10] A disparate pay claim under Title VII requires the intent to discriminate, that is, a desire to pay women less because they

of pay discrimination under the Equal Pay Act ("EPA")[11] due to Menard's failure to compensate her on par with Coriden; and (2) was discharged in retaliation for her assertion of her statutory rights to be free from pay discrimination in violation of the EPA, Title VII,[12] and the Wisconsin Fair Employment Act.[13]

¶ 25. Because of these violations, the panel awarded Sands various monetary damages. She was awarded $267,108 in back wages[14] and an equal amount in liquidated damages[15] for disparate pay and willful violation of the EPA; $114,944.71 in back pay and bonus for lost wages due to termination, as allowed by the EPA and Title VII; $100,000 in compensatory

---

are women. *Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 525 (7th Cir. 1994). The panel concluded that Sands did not satisfactorily show that she was paid less because of her gender.

[11] 29 U.S.C. § 206(d) (2006). All subsequent references to the United States Code are to the 2006 version unless otherwise indicated. An EPA pay discrimination claim does not require a showing of intent as is required under Title VII.

[12] 42 U.S.C. § 2000e-16(a)-(b). Though the panel concluded that Sands did not prove her Title VII pay discrimination claim, the panel did find that she suffered an adverse employment action in retaliation for asserting her rights under Title VII.

[13] Wis. Stat. § 111.36 (2007–08). All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[14] Back wages are the wages the employee should have received had he or she been paid appropriately. Under the EPA, an employee may recover back wages for the two-year period immediately preceding his or her claim. If a willful violation of the EPA is found to have occurred, the back pay period can be extended to three years, as it was in this case.

[15] Liquidated damages under the EPA consist of an additional sum of money equal to the back wages already due to an employee.

damages for emotional distress; and $900,000 in puni-
tive damages. Menard also was required to pay Sands'
attorneys' fees, which totaled $129,120.25. In sum,
Menard's obligations totaled $1,778,280.96.

¶ 26. In addition to these monetary damages, the
panel ordered that Sands be reinstated to the position
of Vice President and Executive General Counsel
within 30 days of the date of the award. Sands' rein-
statement was to come with a salary of $166,250, to be
increased to $175,000 effective January 1, 2008. The
panel also ordered Menard to pay her a profit sharing
bonus of 15% of her 2007 earnings.

¶ 27. As justification for the reinstatement
award, the panel noted that reinstatement is one of the
remedies available for violation of the EPA and Title
VII. *See* 29 U.S.C. § 215(a)(3); 42 U.S.C. § 2000e-5(g)(1).
It also noted that front pay may be ordered in lieu of
reinstatement when reinstatement is inappropriate,
citing *Williams v. Pharmacia, Inc.,* 137 F.3d 944, 951–52
(7th Cir. 1998). The panel explained its decision thusly:

> In this case, Sands argues that reinstatement to her
> position . . . would be inappropriate in light of the
> company's, particularly John Menard's, conduct toward
> her. Whether to award reinstatement or front pay to
> Sands is a difficult decision. The Panel recognizes that
> John Menard clearly was hostile to Sands at and near
> the time of her termination (as well as toward her
> sister, Debra Sands, thereafter, including during the
> pendency of these proceedings), and that such a consid-
> eration could be a basis for awarding front pay in lieu of
> reinstatement. On the other hand, not to reinstate
> Sands would, in some sense, reward the company for its
> mistreatment of her and, moreover, would tend to send
> the wrong message to company employees who other-
> wise might be inclined to make meritorious complaints
> about unlawful conduct occurring within the company.

On balance, the Panel has concluded that reinstatement is the appropriate approach here, on the ground that reinstatement is the favored remedy under the law.

¶ 28. After the arbitration award was handed down, Menard prepared a check for the full amount of the panel's monetary award. In a letter to Sands, Menard indicated that the check was available to pick up, but that Menard would not reinstate Sands. Despite many additional communications between the parties, Menard continued to refuse to reinstate Sands.

## D. The Case Goes to Court

¶ 29. On December 20, 2007, Sands filed suit in the Circuit Court for Eau Claire County, Paul J. Lenz, Judge, seeking to clarify the arbitration award and subsequently confirm it.[16] In addition to other claims,[17] Sands sought to compel Menard to abide by the terms of the reinstatement award. Menard filed a motion to vacate the award in full or in part, maintaining that the attorney-client relationship is vital to a company, as is the right to choose counsel, and that because of their broken relationship, Sands could no longer represent Menard, Inc., the Menards brothers, or their interests. Sands responded that she could represent Menard, and

[16] Before filing suit, Sands asked the arbitration panel to clarify the award, alleging that the panel made various computational errors and that her award should be increased. The panel, however, held that it had no jurisdiction to consider her request because Sands' motion did not truly seek clarification of the award, but was instead a motion to reconsider or correct the award, which the panel did not have the power to do.

[17] Sands also argued that her damages were incorrectly calculated. The circuit court denied Sands' motion to adjust the award.

that she would accept reinstatement if she could be assured of her personal safety. Judge Lenz confirmed the arbitration award in its entirety and denied all motions to modify, correct, or vacate the award.

¶ 30. Menard appealed, again arguing that the arbitration panel disregarded the law by requiring reinstatement. The court of appeals affirmed. It concluded that reinstatement is a statutory remedy under the EPA and Title VII, and that neither provides an exception for in-house attorneys. *Sands v. Menard*, 2009 WI App 70, ¶ 10, 318 Wis. 2d 206, 767 N.W.2d 332. The court of appeals held that the panel's reinstatement order rested on substantial authority, and that the panel did not manifestly disregard the law. *Id.*, ¶¶ 10–11. Additionally, the court found that awarding front pay in lieu of reinstatement is discretionary, and courts do not review arbitration awards for erroneous exercise of discretion. *Id.*, ¶ 12. To choose one over the other is not a manifest disregard of the law, the court reasoned. *Id.*

¶ 31. Menard then petitioned this court for review, which we accepted.

## II. DISCUSSION

¶ 32. The question before us is whether the arbitration panel exceeded its authority in ordering Sands' reinstatement. In Part A, we review the general legal framework governing reinstatement and front pay in allegations of the type here. In Part B, we examine whether the panel exceeded its authority, concluding that the panel did overstep its bounds in ordering Sands' reinstatement. In Part C, we discuss the appropriate remedy for the panel's error.

## A. Reinstatement and Front Pay Generally

¶ 33. We first turn to a general overview of the remedial framework for Title VII violations,[18] with a specific focus on the remedy of reinstatement.

¶ 34. Under Title VII, courts may "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . ., or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). Reinstatement is the preferred remedy for violations because this accords with making the victim of discrimination whole. *Equal Employment Opportunity Commission v. Kallir, Philips, Ross, Inc.*, 420 F. Supp. 919, 926 (S.D.N.Y. 1976).

¶ 35. However, reinstatement is not appropriate or even possible in all cases. Numerous courts, including the Seventh Circuit, have held that front pay—compensation for projected future earnings—may be awarded in Title VII cases where reinstatement is unavailable or inappropriate. *Williams*, 137 F.3d at 951–52.

¶ 36. Reinstatement may be inappropriate for a number of reasons. Two such overlapping circumstances deserve further attention here.

¶ 37. The most common situation where reinstatement is inappropriate is when the employer-employee relationship is "pervaded by hostility." *Id.* at 952 (citing *McNeil v. Econ. Lab., Inc.*, 800 F.2d 111, 118 (7th Cir. 1986)). This unacceptably high level of hostil-

---

[18] There do not appear to be significant differences in the remedial framework for retaliatory violations of the EPA, Title VII, and the Wisconsin Fair Employment Act.

ity, however, cannot simply constitute employer-generated frustration over the lawsuit. *McKnight v. Gen. Motors Corp.,* 908 F.2d 104, 116 (7th Cir. 1990). Refusing reinstatement because of the natural frustration an employer would feel when an employee files suit "would arm the employer to defeat the court's remedial order." *Id.*[19] But courts have routinely recognized that granting reinstatement is not appropriate when animosity and hostility are so extreme that "a productive and amicable working relationship would be impossible." *Sasser v. Averitt Express, Inc.,* 839 S.W.2d 422, 433 (Tenn. Ct. App. 1992). Whether the level of hostility or animosity is too great to allow reinstatement depends on the facts of the case.

¶ 38. In one case, a U.S. District Court considered an age discrimination suit (under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634) by the Chief Labor Counsel for Union Carbide who was forced to retire upon reaching his 65th birthday. *Whittlesey v. Union Carbide Corp.,* 567 F. Supp. 1320, 1321 (S.D.N.Y. 1983). Though under a different statute, the basic analytical framework regarding reinstatement under Title VII and the ADEA is the same.[20] The court held that reinstatement was not an appropriate remedy, and instead ordered front pay. *Id.* at 1330. It reasoned that:

[19] *See also Taylor v. Teletype Corp.,* 648 F.2d 1129, 1138–39 (8th Cir. 1981) ("To deny reinstatement to a victim of discrimination merely because of the hostility engendered by the prosecution of a discrimination suit would frustrate the make-whole purpose of Title VII.").

[20] *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir. 1992) (stating that interpretations of the ADEA rely on interpretations of Title VII because the substantive provisions of the ADEA were essentially copied from Title VII).

Carbide has exhibited such hostility and outrage against him by reason of his bringing suit, he would certainly have difficulty functioning in the Law Department. By all indications, he would be ostracized and excluded from the functions of giving counsel.

*Id.* Though Carbide's actions were without justification, the court stated, this level of employer-directed hostility rendered reinstatement too difficult.[21] *Id.*

¶ 39. In another case, a U.S. District Court denied reinstatement when an employer referred to the employee as a "cancer" and repeatedly attacked his abilities during trial. *Cancellier v. Federated Dep't. Stores,* 672 F.2d 1312, 1319 (9th Cir. 1982) (affirming the District Court's front pay award). The trial judge concluded that the employee and employer could no longer "co-exist in a business relationship that would be productive to the consumer, community or to the business itself." *Id.* at 1319–20. Hence, reinstatement was inappropriate. *Id.* at 1320.

¶ 40. Similarly, in *Goss v. Exxon Office Sys. Co.,* the Third Circuit affirmed an award of front pay in lieu of reinstatement because of "the likelihood of continuing disharmony in a sensitive job and the difficulty of policing an ongoing relationship." 747 F.2d 885, 890 (3d Cir. 1984). The trial judge had explained its award as follows:

I do not believe that either plaintiff or defendant would seriously contend that it would be sensible to order plaintiff reinstated to a job in which harmonious working relationships are so important after the acrimony

---

[21] The Second Circuit affirmed the District Court's determination on appeal. *See Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 729 (2d Cir. 1984).

> this case has engendered, nor could I possibly draft an injunctive order that would effectively make the existing ill feelings disappear.

*Id.* Again we see that where hostility makes a future working relationship impossible, reinstatement is not an appropriate remedy.

¶ 41. Other courts have similarly found front pay to be more appropriate where antagonism and hostility render working relationships impossible. *See Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir. 1980) (affirming an award of front pay in lieu of reinstatement where the defendant had engaged in psychological warfare against the plaintiff and where reinstatement would have led to retaliation); *Hoffman v. Nissan Motor Corp. in USA*, 511 F. Supp. 352, 355 (D.N.H. 1981) (holding that ordering reinstatement would be inappropriate because it "would be a harbinger of disaster and a catalyst to more litigation"). We stress that this does not leave the victim of discrimination without remedy; front pay is available to make the victim whole.

¶ 42. A second situation where reinstatement may be inappropriate is when the employee served in a managerial or unusually high-level role, as a representative to the public, or other such sensitive position. *Dickerson v. Deluxe Check Printers, Inc.*, 703 F.2d 276, 280 (8th Cir. 1983) ("Those cases in which courts have declined to reinstate injured plaintiffs have frequently involved high level, unique or unusually sensitive positions in defendant's organization."). Success in these positions of trust is difficult or impossible when trust has been broken. Whether the position is such that reinstatement would be unworkable due to the break in the relationship again depends upon the facts of each case.

¶ 43. In one such case, the Southern District of New York awarded front pay in lieu of reinstatement because of the "close working relationship between plaintiff and top executives." *Kallir, Philips, Ross, Inc.,* 420 F. Supp. at 926–27. The court noted that the plaintiff had frequent contact with the employer's clients, "with plaintiff acting as defendant's representative." *Id.* at 927. The court explained:

> Lack of complete trust and confidence between plaintiff and defendant could lead to misunderstandings, misrepresentations and mistakes, and could seriously damage defendant's relationship with its clients. The situation here is quite unlike that presented when reinstatement is sought for an assembly line or clerical worker, or even for an executive whose job is not as sensitive for his employer's interests as is plaintiff's job here. The Court is convinced that after three and a half years of bitter litigation the necessary trust and confidence can never exist between plaintiff and defendant. To order reinstatement on the facts of this case would merely be to sow the seeds of future litigation, and would unduly burden the defendant. Thus, reinstatement will not be ordered in this case.

*Id.* In light of the sensitive nature of the position and litigation "marked by more than the usual hostility between the parties," the court concluded that reinstatement was not appropriate. *Id.* at 926–27.

¶ 44. In *Coston v. Plitt Theatres, Inc.,* 831 F.2d 1321 (7th Cir. 1987), *vacated on other grounds,* 486 U.S. 1020 (1988), the Seventh Circuit upheld the denial of reinstatement for an employee who "was required to hold himself out to the public as a managerial representative of the employer." *Id.* at 1331. The court recognized that the public image of the business could be compromised by a hostile employer-employee rela-

tionship. *Id.* The court also focused heavily on the need for trust and confidence in the plaintiff's managerial position, the lack of which made reinstatement inappropriate. *Id.*

¶ 45. Other cases make clear that the nature of the position is important to the determination of whether reinstatement is appropriate. *Hyland v. Kenner Prods. Co.*, 13 Fair Empl. Prac. Cas. (BNA) 1309 (S.D. Ohio 1976) (denying reinstatement to a person in a management position because she would possess confidential information but lack the trust and confidence of her superiors, and because the parties would not be able to establish a proper working relationship and were very antagonistic toward each other); *Combes v. Griffin Television, Inc.*, 421 F. Supp. 841, 846 (W.D. Okla. 1976) (denying reinstatement to a news anchorman where the "[d]iscord, tension, suspicion, antagonism and sensitivity among them would be productive of a very difficult employment environment, with the particular difficulty of being perceivable to the viewing audience").

¶ 46. These principles emerge from this analysis: While reinstatement is the preferred remedy under Title VII, it is an equitable remedy that may or may not be appropriate depending upon the facts of each case. Where the level of hostility is unusually high, or where the position is a sensitive one requiring a high degree of trust and cooperation between management and the employee, reinstatement is generally not appropriate.[22]

---

[22] *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861–62 (7th Cir. 2001):

> [A] court is not required to reinstate a successful plaintiff where the result would be a working relationship fraught with

## B. The Panel Exceeded Its Authority

¶ 47. Menard challenges the reinstatement portion of the arbitration award on multiple grounds. First, it alleges that the Wisconsin Constitution guarantees Menard its choice of counsel. Second, Menard argues that reinstatement was not feasible and appropriate under governing case law and employment law. Third, it maintains that the arbitrators lacked the authority under the arbitration agreement to order reinstatement. Finally, Menard argues that the panel exceeded its authority by ignoring the Rules of Professional Conduct for attorneys.

¶ 48. Our review of arbitration awards is limited. *Lukowski v. Dankert,* 184 Wis. 2d 142, 149, 515 N.W.2d 883 (1994). Our task is to ensure that the parties receive what they bargained for—the adjudication of their dispute via the arbitration process. *Id.* Though limited, a court's role is not a mere formality; a court must overturn an arbitrator's award when the panel exceeds its powers. Wis. Stat. § 788.10(1)(d). An arbitration panel exceeds its powers when it engages in perverse misconstruction or positive misconduct, when the panel manifestly disregards the law, or where the award itself is illegal or violates strong public policy.

hostility and friction. Reinstatement in such situations could potentially cause the court to become embroiled in each and every employment dispute that arose between the plaintiff and the employer following the plaintiff's reinstatement. . . .

. . . [R]einstatement may become particularly infeasible if the plaintiff would no longer enjoy the confidence and respect of his superiors once reinstated. Reinstatement may also be more problematic when the plaintiff holds a management position, or would be supervised by the same individuals who discriminated against him in the first place. (citations omitted).

*Racine County v. Int'l Ass'n of Machinists & Aerospace Workers,* 2008 WI 70, ¶ 11, 310 Wis. 2d 508, 751 N.W.2d 312. Whether the panel's decision meets any of these standards is a question of law we review de novo. *Id.*

■■

¶ 49. We conclude that an attorney's ethical obligations, particularly an attorney's duty of loyalty to her clients under our cases and the Rules of Professional Conduct, embody the strong public policy of the State of Wisconsin. Therefore, an arbitration panel exceeds its powers when it orders the reinstatement of an attorney where reinstatement would clearly lead to a violation of that attorney's ethical obligations. Moreover, we are persuaded that the panel exceeded its authority here because reinstatement of Sands would cause her to violate her ethical obligations as an attorney.[23]

■■

¶ 50. It is a rare occasion for this court to overturn an arbitration award on public policy grounds. The public policy exception to the general rule of judicial deference should be narrowly construed and limited to situations where the public policy "is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *State v. New England Health Care Employees Union,* 855 A.2d 964, 970 (Conn. 2004). A public policy violation must be clear, and the burden of proving such a violation rests with the party seeking to overturn the award. *Id.*

---

[23] Because we are persuaded that the panel violated strong public policy in awarding Sands' reinstatement, we need not address Menard's other arguments.

¶ 51. We stand on firm ground in this case, however, because this court has supervisory authority over the practice of law in Wisconsin. Wis. Const. art. VII, § 3(1); *State v. Cadden,* 56 Wis. 2d 320, 324, 201 N.W.2d 773 (1972). The legal profession is unique in that it is mostly self-regulating with ultimate authority vested largely in the courts. SCR ch. 20 Preamble (10). As part of our oversight, we have adopted Rules of Professional Conduct to guide attorney conduct. *See* SCR ch. 20.

¶ 52. While the Rules vary in emphasis and importance, some rules are so deeply established as to embody the strong public policy of the State of Wisconsin. For example, we could not countenance an arbitration award that ordered an individual to engage in the unauthorized practice of law, or one that ordered an attorney to use funds from the attorney's trust account in a fashion prohibited by the Rules of Professional Conduct. Similarly, we cannot countenance an award that forces an attorney to represent a client when it is clear that the complete disintegration of mutual goodwill, trust, and loyalty renders ethical representation by that attorney impossible.

¶ 53. Attorneys owe a fiduciary duty of loyalty to their clients. *Berner Cheese Corp. v. Krug,* 2008 WI 95, ¶ 41, 312 Wis. 2d 251, 752 N.W.2d 800. This obligation of absolute loyalty means that attorneys are required to act solely for the benefit of their clients. *Zastrow v. Journal Commc'ns, Inc.,* 2006 WI 72, ¶ 31, 291 Wis. 2d 426, 718 N.W.2d 51. Several Supreme Court Rules are aimed at enforcing this duty, including the requirement in SCR 20:1.7(a)(2) that attorneys may not represent clients when "there is a significant risk that the representation . . . will be materially limited by . . . a per-

sonal interest of the lawyer." Indeed, the confidence and trust underlying the attorney-client relationship are foundational to the practice of law and deeply rooted in our law[24] and Professional Rules.[25] *See, e.g., State v. Meeks,* 2003 WI 104, ¶ 59, 263 Wis. 2d 794, 666 N.W.2d 859 ("'The attorney-client privilege provides sanctuary to protect a relationship based upon trust and confidence.").[26]

¶ 54. While it is unusual for a reinstatement award to be vacated on public policy grounds, it is not unheard of. *See, e.g., Newsday, Inc. v. Long Island Typographical Union,* 915 F.2d 840 (2d Cir. 1990)

[24] Article I, § 21, cl. 2 of the Wisconsin Constitution provides: "In any court of this state, any suitor may prosecute or defend his suit either in his own proper person or by an attorney of the suitor's choice." While we need not address whether this provision precludes the reinstatement of Sands in this situation, this provision provides further support for the notion that the mutuality of trust underlying the attorney-client relationship is central in our laws.

[25] *See* SCR ch. 20 Preamble (9) ("[T]he basic principles underlying the rules . . . include the lawyer's obligation zealously to protect and pursue a client's legitimate interests . . . while maintaining a professional, courteous and civil attitude toward all persons involved in the legal system."); SCR 20:1.7 cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.").

[26] *See also State v. Suemnick,* 63 Wis. 2d 117, 118, 216 N.W.2d 753 (1974) ("It goes without saying that the cornerstone of an attorney-client relationship must be a feeling of absolute trust in the attorney by the client."); *In re Law Examination of 1926,* 191 Wis. 359, 362, 210 N.W. 710 (1926) ("An attorney occupies a fiduciary relationship towards his client. It is one of implicit confidence and of trust . . . . There is no field of human activity which requires a fuller realization with respect to a fiduciary relationship than that which exists between the lawyer and his client.").

(vacating a reinstatement award on public policy grounds when sexual harassment made the work environment too hostile); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 861 F.2d 665 (11th Cir. 1988) (vacating a reinstatement award on public policy grounds when the employee, a pilot, flew while intoxicated).

¶ 55. There is also precedent for the proposition that an attorney's ethical duties constitute strong public policy and can be grounds for vacating an arbitration award. For example, in *Perkins & Mario, P.C. v. Annunziata,* an arbitration award resulting from a legal fees dispute was vacated on the grounds that it violated the general statutory prohibition protecting injured persons from excessive legal fees, and because the award was in contravention of attorney ethics rules regarding contingent fee agreements. 694 A.2d 1388 (Conn. App. Ct. 1997).[27] Similarly, another court held that a clause in a partnership agreement between two lawyers could not be subject to arbitration because the clause violated a strong public policy found in the attorney code of ethics and was therefore void. *In re Silverberg,* 75 A.D.2d 817 (N.Y. App. Div. 1980).[28]

---

[27] Deference to arbitration awards is a nearly universal policy in state and federal courts. The law governing review of arbitration and the grounds for overturning an award are also very similar across state and federal courts.

Wisconsin's arbitration statute is nearly identical to the federal statute in 9 U.S.C. § 10. As such, this court will look to federal cases to assist in our interpretation. *Diversified Mgmt. Servs., Inc. v. Slotten,* 119 Wis. 2d 441, 446, 351 N.W.2d 176 (Ct. App. 1984). The similar analytical framework between states also means that state decisions will often have persuasive value as well.

[28] Other courts have similarly recognized that an arbitration award contrary to attorney ethics may be vacated on public

¶ 56. In this case, it is clear that Sands cannot in good faith represent Menard without violating her ethical obligations as an attorney.

¶ 57. Leading up to and throughout the arbitration process, all parties agreed that the relationship was irretrievably broken. Sands understood this and unequivocally testified *against* reinstatement before the arbitration panel, even going so far as to state that "no reasonable person would entertain reinstatement as a possibility." She further made clear her view of the prospective employment conditions at Menard, stating, "[I]t would be impossible to return to such a hostile environment." Understanding that reinstatement was not feasible or available here, Sands sought two years of front pay instead.

¶ 58. Sands also made clear her views of Menard's leadership—her clients if reinstatement were upheld. In her briefing before the arbitration panel, Sands stated that John Menard's conduct was "so monstrous and reprehensible that it shocks the conscience"; that he is a "reckless, callous actor who care[s] nothing about anyone else's rights or reputation"; that he "is a man with no parameters, no limits, no respect for the law and obviously, no self-discipline to control or limit his own behavior—nor does he see any need to"; that his honesty and integrity are "completely illusory"; and that his "dishonesty is serious and overwhelming."

¶ 59. Let there be no mistake—the mutual animosity and distrust between Sands and the executive

policy grounds. *See Schoonmaker v. Cummings & Lockwood of Connecticut, P.C.,* 747 A.2d 1017 (Conn. 2000) (recognizing that the Rules of Professional Conduct can serve as a public policy ground on which to vacate arbitration awards, though ultimately choosing not to do so in that case); *Weiss v. Carpenter, Bennett & Morrissey,* 672 A.2d 1132 (N.J. 1996) (same).

leadership of Menard, the very people to whom her absolute loyalty would be owed, continued throughout the arbitration hearing and shows no signs of abating today. Sands was right. No reasonable person would consider reinstatement a possibility in this situation. No one could have assessed this situation and determined that reinstatement could lead to a productive setting where both Sands and Menard would benefit. Trust has been completely broken; nothing good could possibly come from reinstatement. In view of this especially bitter litigation marked by personal and professional animosity, we see no way Sands could now return to Menard and serve the company in conformity with her ethical obligations.

¶ 60. If the level of hostility alone was not enough, Sands performed an unusually high-level and sensitive role at Menard. She was the Executive General Counsel, heading up the in-house legal operations and supervising the legal work for all of Menard. She also served as Menard's spokesperson and was a public representative to the community. More than most attorneys, her position required a high degree of confidence and trust and a close relationship with Menard's executive leadership. In order to perform her role, Sands had to represent the company's best interests with outside partners, attorneys, and the media. Sands' unique and significant role at Menard required the highest level of good faith, loyalty, and mutual trust.

¶ 61. The relationship between Sands and Menard, then, has been irretrievably broken. Sands' view of Menard's leaders is clear, and Menard has similarly not hidden its view that trust and confidence in Sands cannot be restored under these circumstances. We see no possible way Sands could, following this protracted litigation and acrimony, step in and serve Menard as

677

her ethical obligations would require.[29] Without question, there is, in the words of SCR 20:1.7(a)(2), "a significant risk that the representation . . . will be materially limited by . . . a personal interest of the lawyer."

¶ 62. In its written award, the panel discussed the difficulty that hostility posed to reinstatement. It recognized both John Menard's hostile behavior toward Sands, and that Sands believed reinstatement would be inappropriate as a result of the hostile relationship. In the end, the panel chose reinstatement because front pay, it felt, would "reward the company for its mistreatment" and "would tend to send the wrong message to company employees who otherwise might be inclined to make meritorious complaints about unlawful conduct occurring within the company."

¶ 63. Though the panel's decision was otherwise thorough, nowhere did the panel consider the applicability of Sands' ethical obligations as an attorney.[30] It never examined whether Sands could ethically perform her role if it awarded reinstatement. If it had, it would have reached the same conclusion Sands had: no reasonable person would entertain reinstatement as a possibility.

¶ 64. The panel was right in seeking to make Sands whole. Even though it seemed to understand the

---

[29] We are satisfied that the conflict of interest between Sands and Menard is enough to prohibit reinstatement. We decline to address the applicability of other portions of the Rules.

[30] The dissent curiously chides us for not citing the record to support the notion that the panel did not consider attorney ethics. *See* dissent, ¶ 80. Nothing in the record reflects that the panel considered Sands' ethical duties. Moreover, nothing in the panel's written award evinces a consideration of Sands' ability to represent Menard again as an attorney.

complete breakdown in the relationship, the panel went forward anyway in order to send a message. While a message surely needed to be sent—and it was, to the tune of more than $1.6 million, including $900,000 in punitive damages—we conclude that reinstatement of Sands in this situation would cause her to violate her ethical obligations as an attorney. We further hold that an arbitration award requiring an attorney to violate her ethical obligations is void as a matter of strong public policy. The panel therefore exceeded its powers under Wis. Stat. § 788.10(1)(d). *Racine County*, 310 Wis. 2d 508, ¶ 11.

¶ 65. We do not conclude that reinstatement is always inappropriate for in-house lawyers or general counsels,[31] or that reinstatement is always inappropriate when the relationship is acrimonious or the employee served in a high-level role. The specific circumstances of each case must be considered. Here, it is our judgment that the panel's reinstatement order would have the practical effect of forcing Sands to violate her ethical obligations. Such a result violates the strong public policy of the State of Wisconsin.

## C. Remedying the Panel's Error

¶ 66. Because the panel exceeded its powers, the reinstatement award cannot stand. Under Wis. Stat.

---

[31] This case presents the difficult question of whether the Rules of Professional Conduct give employers the right to discharge their in-house attorney employees at any time. Normally, attorneys may not represent clients when they have been discharged. *See* SCR 20:1.16(a)(3). But the question becomes more difficult in light of non-discrimination laws that protect in-house attorneys just as they do non-attorney employees. Because we determine that the panel exceeded its authority in awarding reinstatement, we save this question for another day.

§ 788.10(1)(d), an award may be vacated "[w]here the arbitrators exceeded their powers." As we have already explained, arbitrators exceed their powers when their award is in violation of strong public policy.

¶ 67. Both parties agree that the court may vacate the reinstatement portion of the award while leaving the rest intact.[32] Menard urges us to vacate the reinstatement award and thus end the dispute. Sands argues that if we find reinstatement improper, we should remand for an award of front pay to effectuate the panel's clear intention to make the successful plaintiff whole.

¶ 68. We agree with Sands. Reinstatement is intended to put the employee in the position he or she would have been in before the adverse employment action. But courts have recognized that where reinstatement is inappropriate, "an award of front pay as a substitute for reinstatement . . . [i]s a necessary part of the 'make whole' " purposes of Title VII. *Pollard v. E. I. du Pont de Nemours & Co.,* 532 U.S. 843, 850 (2001). Like reinstatement, front pay is an equitable remedy. *Williams,* 137 F.3d at 951. It "is the functional equivalent of reinstatement because it is a substitute remedy that affords the plaintiff the same benefit (or as close an approximation as possible) as the plaintiff would have received had she been reinstated." *Id.* at 952.

¶ 69. The panel made clear that it was going to award either front pay or reinstatement ("Whether to award reinstatement or front pay to Sands is a difficult

---

[32] *See Commc'ns Workers of Am. v. AT&T Co.,* 903 F. Supp. 3, 6 (D.D.C. 1995) (holding that courts may vacate the portions of an arbitrator's award that exceed the arbitrator's authority while enforcing the remainder).

decision."). In order to make Sands whole in accord with the intentions of the arbitration panel, we vacate the award of reinstatement and remand to the circuit court for a determination on the equities of an appropriate front pay award.

## III. CONCLUSION

¶ 70. In sum, we agree with Menard that the panel exceeded its authority. An arbitration panel exceeds its authority when its award violates strong public policy. An attorney owes a fiduciary duty of loyalty to her clients, a duty so replete in our cases and in the Rules of Professional Conduct as to be axiomatic. Such a duty is deeply rooted in our laws and embodies the strong public policy of the State of Wisconsin. In this case, we conclude that by accepting reinstatement, Sands would be forced to violate her ethical obligations as an attorney. Thus, we vacate the panel's award of reinstatement on the grounds that it is void as a violation of strong public policy. Under the applicable employment discrimination laws, front pay is a substitute for reinstatement. Accordingly, we vacate the panel's award of reinstatement and remand to the circuit court to determine an appropriate award of front pay.

*By the Court.*—The decision of the court of appeals is reversed and remanded.

¶ 71. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I do not join the majority opinion because I conclude that the majority has "exceeded its powers" by "manifestly disregarding the law" in its decision to vacate the arbitration panel's award of reinstatement.

¶ 72. I agree with the circuit court and court of appeals, both of which denied Menard's motion to vacate the arbitration award for reinstatement of Dawn

681

Sands. These courts reached the right result, largely because they correctly understood the very limited role courts play in reviewing arbitration awards.

¶ 73. At the circuit court, Judge Lenz observed that "at most, I find that this would be an error of law or fact and not enough to overturn the award. The arbitration panel did an analysis, looking at the . . . hostile environment . . . so they did what they were supposed to do." With regard to the claim that the award could be vacated for public policy reasons, the circuit court reasoned that "when a court bars enforcement of an arbitration award on public policy, that public policy must be clearly defined . . . and dominant. . . . the arbitrator balanced it out, they talked about it, that's not a situation where it is an explicit public policy that is well-defined and dominant and referenced to the laws and legal precedent."[1]

¶ 74. At the court of appeals, Menard's claims were similarly dismissed as not approaching the standard for a court to vacate the discretionary remedy awarded in an arbitration to which the parties have voluntarily submitted. The court of appeals explained, "Menard essentially asks that we create law stating reinstatement is not a remedy for in-house attorneys . . . . This is inconsistent with the standard of

[1] The circuit court relied on *Local P-1236 v. Jones Dairy Farm*, 680 F.2d 1142, 1145 (7th Cir. 1982).

The circuit court further recognized, as the majority does not, that its own view of whether the award was "appropriate" or a good idea was not at issue. Judge Lenz commented, "[T]he court may look at this and say that part of the award was really stupid . . . but the court doesn't substitute its judgment for the judgment of the arbitrator because that's not what you bargained for."

review. We cannot conclude the arbitrators manifestly disregarded law that was nonexistent at the time of the arbitrators' decision."

¶ 75. Now, after Menard, who initially submitted to arbitration, has challenged the outcome of that arbitration through three courts, the majority does just what the court of appeals recognized that courts could not and should not do: The majority recognizes for the first time a "clear strong public policy" and concludes, as the panel did not, that the arbitration award would clearly lead to a violation of Sands' ethical obligations as an attorney and thereby violate public policy. On the basis of its newly announced public policy, and its own conclusion that the panel award would necessarily violate that policy, the majority vacates the arbitration award in the very case where it first sets forth the policy. Yet the ordinary standard of review is that "[i]f the correctness of the award, including its resolution of the public-policy question, is reasonably debatable, judicial intervention is unwarranted."[2]

¶ 76. The majority's result undermines the goals and practice of arbitration in Wisconsin and defeats the intent of the parties who entered this arbitration in particular. How will parties in the future who voluntarily submit to arbitration be confident that the efficient and final resolution that arbitration promises will not be set aside by this court? What other "strong public policies" may be lurking, not-previously articulated, that this court could use to vacate an arbitration award that one party seeks to escape and with which four members of this court simply disagree?

[2] *Weiss v. Carpenter, Bennett & Morrissey*, 672 A.2d 1132, 1144 (N.J. 1996).

¶ 77. It may well be that in some cases a direct conflict will arise between the mostly state laws governing the attorney-client relationship and the mostly-federal statutes and case law governing employment discrimination, including the provisions for reinstatement. As nearly as I can tell, this touches on a question of first impression, whether in some circumstances, employment reinstatement ordered under the federal employment law may violate a state's attorney-client law, and if so, how to resolve the two?[3] But the place to resolve novel and emerging questions of law is not in a court's review of a private arbitration award. Parties submit disputes to arbitration to reach swift resolution and specifically to avoid the lengthy appeals in which courts can definitively resolve every question of law and in the process create precedent.[4] Review of an arbitration to which parties voluntarily submitted is not the appropriate vehicle for this court to announce new rules of law or to hold forth about generalized public policy.

---

[3] A Non-Party Brief filed in this case asserts that "the Court is faced with a case of first impression" and further describes the potential tension in the law governing "in-house" attorneys:

> While in-house counsel enjoy the same attorney/client relationship that attorneys in private practice have with their clients, in-house counsel also have the relationship of employer and employee, and those two separate relationships can be the source of tension as someone whose livelihood is tied to one employer must also respect and fulfill his or her professional duties as an attorney.

Non-Party Brief of Byron F. Egan, 2, 6.

[4] *See* majority op., ¶ 48 ("Our task is to ensure that the parties receive what they bargained for—the adjudication of their dispute via the arbitration process." (citing *Lukowski v. Dankert,* 184 Wis. 2d 142, 149, 515 N.W.2d 883 (1994)).

¶ 78. Although the majority's conclusions about a public policy are indeterminate, there is no doubt that attorneys have fiduciary and ethical duties and obligations of professional conduct. Other employees also have fiduciary and ethical obligations to their employers.

¶ 79. The problem is that the majority is unable to pin down a particular rule, duty, or obligation or offer more than its own repeated assertions that if the award stands, a violation of ethical obligations would be the necessary result. The majority claims that because the panel did not affirmatively discuss Sands' ethical duties as an attorney, this necessarily implies that the panel "never examined whether Sands could ethically perform her role if it awarded reinstatement." Majority op., ¶ 63. The majority parlays this supposition into the conclusion that the award of reinstatement "would have the practical effect of forcing Sands to violate her ethical obligations." Majority op., ¶ 65. Both the claim and the observation are at best speculative and moreover are belied by the record.

¶ 80. There is no reason to believe, much less to affirmatively conclude as the majority has done, that the arbitration panel did not consider the applicability of Sands' ethical obligations as an attorney. It is no secret that Sands is an attorney. Through its 49–page factual review, legal analysis, and ultimate findings, the panel was amply aware of Sands' professional role and her responsibilities toward the Menard corporation, its officers, and the individuals representing the corporation. The panel explicitly acknowledged the "difficult[y]" of the "hostile" relationship between the parties. In doing so they necessarily assessed the dynamic between attorney and client and the issues inherent therein. Even if there were uncertainty as to what law

the panel did or did not consider, the majority oversteps its bounds in review of an arbitration award when it construes ambivalence or silence in the record to justify overturning a result it disfavors. As the majority recognizes, the party seeking to overturn the panel award bears the burden of proof.

¶ 81. Significantly, Sands and Menard explicitly stipulated that each member of the panel would be an attorney. Each of the arbitrators was an experienced and successful attorney, themselves bound by the Rules of Professional Conduct and bound to be versed in those rules, which the majority opinion invokes to justify its result in the present case.

¶ 82. According to Martindale-Hubbell and the law firm Web sites of each of the arbitrators, Attorney Peter Reinhardt has been licensed to practice in Wisconsin for 15 years, specializes in employment law, and has appeared before this court as well as the Federal 7th and 8th Circuit Courts of Appeals; Attorney Carol Skinner has been licensed to practice in Wisconsin for 26 years and specializes in employment law as well as alterative dispute resolution; and Attorney Aaron Halestead has been licensed to practice in Wisconsin for 20 years, specializes in employment law, and is a long-time member of the Board of Directors of the Labor and Employment Section of the State Bar of Wisconsin, where he served as Chairperson from 2003–04.

¶ 83. It strains credulity when the majority assumes these three attorneys failed to consider the rules of their profession or the nature of the attorney-client relationship when they assessed whether a reinstatement award would be feasible on the facts before them. The majority considerably exceeds the supervisory role of a court in review of an arbitration award when it

construes the record to presume that a capable arbitration panel somehow ignored the obvious.

¶ 84. The majority declares that in order to vacate an arbitrator's award on the grounds of public policy, "[a] public policy violation must be clear, and the burden of proving such a violation rests with the party seeking to overturn the award." Majority op., ¶ 50. The majority does not, however, apply this standard to the instant case.

¶ 85. Rather, the majority attempts to persuade us that every one of the three arbitrators, along with the circuit court judge, the three judges on the court of appeals panel, and Sands herself, all lawyers, all overlooked a "clear violation of a strong public policy" and that all the lawyers involved in the present case overlooked the majority's own determination that "Sands cannot in good faith represent Menard without violating her ethical obligations." Majority op., ¶ 56.

¶ 86. While apparently the public policy relied on by the majority was neither so "clear" nor so "strong" that any prior attorney or tribunal spotted it, the majority nevertheless pronounces that it "cannot countenance" the panel's award of reinstatement on the basis of a newly-minted "clear strong public policy." *See* majority op., ¶ 52.

¶ 87. The strong public policy violated here, in the majority's view, is apparently embedded in an attorney's various ethical obligations.[5] Majority op., ¶ 49. The

---

[5] I qualify my statement as an "apparent" conclusion because the majority's opinion seems to float between multiple articulations of the public policy that was violated. The majority first seems to rest its holding on Sands' unspecified "ethical obligations, particularly an attorney's duty of loyalty", but the majority cites only one specific section of the Rules of Professional Conduct (SCR 20:1.7(a)(2)). *See also* majority op., ¶ 53.

majority discusses in general terms the attorney's fiduciary duty of loyalty and the Rules of Professional Conduct, SCR 20:1.7(a)(2), relating to "a personal interest." Majority op., ¶¶ 53, 61.

¶ 88. The majority cites SCR 20:1.7(a)(2), which states that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by . . . *a personal interest* of the lawyer" (emphasis added).

¶ 89. The majority goes on to hold that it is "clear that Sands can not in good faith represent Menard without violating her ethical obligations as an attorney." Majority op., ¶ 56. The majority's opinion is unpersuasive. It is far from clear that if the reinstatement award stands, Sands will necessarily violate this ethical obligation.

---

Despite this, the majority also makes liberal use of generic references to attorneys' fiduciary duties of loyalty to clients, and the "confidence and trust underlying the attorney-client relationship," as established by case law. *See, e.g.,* majority op., ¶ 53.

In light of these references, it is unclear whether the majority relies solely on SCR 20:1.7(a)(2) or on an amalgam of this one rule and other sources of more general ethical obligations. If the basis for vacating the award is a hypothesized violation of one rule, how does the majority conclude that this is "strong public policy," rather than a simple attorney ethics violation? If, on the other hand, discerning the "public policy" that would allegedly be violated by reinstatement requires the majority to rely on novel inferences to reach its conclusion, how then was the arbitration panel to recognize a public policy that meets the standard "that when a court bars enforcement of an arbitration award on the basis of public policy, that public policy must be clearly defined"? *See Local P-1236 v. Jones Dairy Farm,* 680 F.2d 1142, 1145 (7th Cir. 1982).

688

¶ 90. First, the commentary to this section of the Rules, SCR 20:1.7(a)(2) indicates that the phrase "personal interest" refers not to one's own emotive state or stake, but rather to substantive, material conflicts of interest.[6] Notably, the comments identify business-related examples, such as "when a lawyer has discussions concerning possible employment with an opponent of the lawyer's client," and further direct the reader to "Rule 1.8 for specific Rules pertaining to a number of personal interest conflicts, including business transactions with clients." No such objective, material business conflict has been identified here as a conflicting "personal interest" of Sands. Instead, the majority seems to stretch the meaning of "personal interest" to the subjective and amorphous area of Sands' "feelings" toward Menard.

¶ 91. The majority comes up short on citations to cases in Wisconsin or any other jurisdiction that have interpreted the Rules of Professional Conduct to cover "feelings" analogous to what the majority argues is the problem here, although the majority opinion is filled with pronouncements about a lawyer's obligations to the client and the strong public policy of the state of Wisconsin. Under these circumstances, with apparently no prior precedent, how can the majority conclude that Menard has met its burden of proving such a violation, let alone that it is clear or obvious that public policy would be violated by this award? The obvious conclusion is that Menard has not met its burden. The majority's contrary conclusion represents the majority's flat refusal to apply the standard of review that it espouses. "The court will not relitigate issues submitted

---

[6] *See* Wis. Stat. Ann. SCR 20:1.7 (2009) (setting forth the ABA Comments).

to arbitration." *Franke v. Franke,* 2004 WI 8, ¶ 3 & n.8, 268 Wis. 2d 360, 674 N.W.2d 832 (quoting *Joint Sch. Dist. No. 10 v. Jefferson Educ. Ass'n,* 78 Wis. 2d 94, 116–18, 253 N.W.2d 536 (1977)).

¶ 92. Second even assuming that "feelings" are within the scope of SCR 20:1.7(a)(2), this case still does not provide sufficient support for the majority's contention that Sands would "clearly" violate her ethical obligations by that "personal interest." While the majority cites a string of emotionally charged language from Sands at the arbitration hearing,[7] this reference does little more than establish Sands' level of personal affront from the situation of her discharge, a view which was apparently shared by the panel that ordered reinstatement. Her statements do not establish that an ethics violation either had or would occur if the reinstatement award were to stand. Of all the quotes reported by the majority in sensationalist fashion, none refers at all to Sands' opinion or that of the panel or any other party as to her own future conduct or ethical obligations with respect to Menard.[8]

---

[7] Majority op., ¶¶ 57–58.

[8] To support the proposition that an attorney's ethical duties constitute public policy grounds to vacate an arbitration award, the majority cites two cases in which a specific rules violation would be compelled by an arbitration award. *See* majority op., ¶ 55. In the present case, no specific rules violation is identified that would necessarily follow from the award. In both of the cited cases, the parties had already entered private agreements that would violate specific rules provisions if enforced by arbitration, a result the courts did not allow.

In *Matter of Silverberg,* 75 A.D.2d 817, 427 N.Y.S.2d 480 (N.Y. App. Div. 1980), the court did not vacate an arbitration award. The petitioner sought enforcement of a partnership

¶ 93. Thus it is not clear at all what specific ethical breach the majority fears, or from exactly what "personal interest" of Sands it would stem, much less that any breach at all is an inevitable foregone conclusion. Such a vague rationale would not suffice for a trial court's sua sponte disqualification of an attorney.[9] It is hard to see how an equally vague expectation of a conflict is sufficient to allow this court, barred from free-wheeling fact-finding and limited to a supervisory role in reviewing an arbitral award, to reach the conclusion that a future ethics violation is a certainty.

provision that prevented other members of his firm from servicing his clients. The court held that the provisions of the partnership agreement, if enforced, would violate the Code of Professional Responsibility Disciplinary Rules 2–107. The court therefore refused to allow the matter to be arbitrated. The case is unlike the present case, where no rules violation would be a necessary result and the parties have already voluntarily agreed to arbitration.

In *Perkins & Mario, P.C. v. Annunziata,* 694 A.2d 1388 (Conn. App. 1997), the arbitral panel awarded legal fees to a discharged attorney who handled a personal injury matter on a contingency fee basis and had no written fee agreement. The Rules of Professional conduct forbid such an arrangement, and the result would also have violated a statute prohibiting excessive legal fees. The court vacated the award on appeal, which it recognized as "the exceptional case": where the award in contravention of both statute and a very specific rules provisions "violates clear public policy."

[9] *See State v. Peterson,* 2008 WI App 140, ¶ 23, 314 Wis. 2d 192, 757 N.W.2d 834 (finding "attorney disqualification should not be imposed cavalierly" and a lower court's decision to disqualify an attorney was an erroneous exercise of discretion because "the court did not explain what problem it anticipated if [the attorney] continued, the court did not describe any potential ethical violation that might arise . . . before deciding to disqualify [the attorney].").

¶ 94. The majority restates its conclusion that Sands cannot ethically represent Menard in various ways: that "no reasonable person would consider reinstatement"; that "a productive setting" was not possible; that "nothing good could possibly come from reinstatement." None of these conclusions is tied to any legal standard or any particular attorney ethics obligation. Together they offer little more than the majority's own restatement of its speculation about the facts that would result from reinstatement. Again, the majority does not meet the standard of establishing a clear public policy or show that Menard has met the burden of proof.

¶ 95. Third, the majority's holding that letting the reinstatement award stand would "force" or "require" Sands to violate her ethical obligations is not supported by the record and defies logic. The majority assumes that only a single course of conduct can result from Sands' reinstatement—namely, Sands' professional misconduct following a return to employment at Menard.

¶ 96. Suppose, faced with reinstatement, both parties accede to Sands' return. It is neither impossible nor unreasonable to think that as the resolution gleaned from arbitration took hold, hurt feelings would fade and be overtaken by the professional nature and interests of both parties.[10] It is entirely possible that Sands could resume her representation with no ethical violation whatsoever. More importantly, the award of reinstatement gives Sands the opportunity to make that assessment for herself. Sands would be the most capable person to do so. Oddly, the majority seems to find itself better positioned than the lawyer involved.

---

[10] In point of fact, this very proceeding now demonstrates the likeliness of that outcome had reinstatement been left undisturbed, as Sands today states she is both willing and able to continue to professionally represent Menard.

The majority without hesitation reports "it is clear that Sands cannot in good faith represent Menard without violating her ethical obligations as an attorney."

¶ 97. With great self-certainty, the majority concludes that "an arbitration award *requiring* an attorney to violate her ethical obligations is void as a matter of strong public policy." Majority op., ¶ 64 (emphasis added). Yet nothing in the award of reinstatement *requires* Sands to violate her ethical obligations. If, as the majority predicts, allowing the reinstatement award to stand would force or require Sands to commit an ethical obligation, then she has a simple solution: resign. It was Menard that defied the reinstatement award, not Sands. In the event Sands resigns, the panel's award might in fact result in less than the make-whole remedy intended by the law, and might represent a "raw deal" for Sands, but courts do not vacate a valid arbitration award simply because the panel has awarded a remedy worth less than a reviewing court later sees as appropriate.

¶ 98. There is another potential outcome that the majority does not acknowledge. If the reinstatement award stands, and if the parties truly view reinstatement as untenable and mutually undesirable, then rather than enter a situation where, in the majority's view, an ethical violation is likely to occur, the parties could simply negotiate a settlement that avoids Sands' actual return to Menard. Courts and commentators alike have recognized that parties are free to reach a more efficient or desirable result by negotiating an alternative solution to a court-imposed remedy.[11] As Judge Posner observed in a case considering employment reinstatement, "the

---

[11] *See, e.g., Youngs v. Old Ben Coal Co.*, 243 F.3d 387 (7th Cir. 2001) (acknowledging the reality of negotiation around judgments granting specific performance: "Youngs is seeking,

social costs of [reinstatement] may be avoided by corrective transactions."[12] In other words, if the parties could not live with reinstatement, they were free to negotiate for another result.[13]

---

but not wanting, specific performance. If he obtained the relief he is seeking, that would just be a prelude to a further negotiation with Old Ben.")

[12] *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1232 (7th Cir. 1995) (citing R.H. Coase, *The Problem of Social Cost*, 3 J. Law & Econ. 1 (1960)).

In the present case, the circuit court did not require academic commentary to recognize as a practical matter that what was at stake was likely just a question of putting a price tag on the reinstatement award. If the circuit court whose order Menard defied recognized that at that time Sands was not likely to actually return to Menard and that an ethical violation was not actually going to take place, how is the majority so certain that the "reinstatement order would have the practical effect of forcing Sands to violate her ethical obligations"? *See* majority op., ¶ 65. The circuit court had a very different view of "the practical effect" of the award:

> [T]he parties agreed to arbitration, and the arbitrator's award, I'm going to use the card game, this is the hand that's dealt out, and somebody got dealt the joker, okay, how much is this worth? They ordered this. How much is this worth?

The circuit court then posited three different alternative ways the court might proceed to place a value on the arbitration under the court's authority:

> Alternative number one is . . . to go back and have that issue arbitrated. . . . Two, that this court now is to provide a value, that is damages, with regard to what the not reinstatement is worth . . . Or third . . . file a separate law suit . . . have a jury decide how much this was worth.

[13] An argument can be made that such a negotiated result would better establish the "make whole" value of what reinstatement (or avoiding reinstatement) is actually worth to the parties, rather than asking a court to provide this value though an award of damages or a determination of front pay. "Promisees know

¶ 99. Given the panel's awareness of Sands' ethical responsibilities as an attorney, given the panel's consideration of the relationship between the parties, given the majority's conclusory and unsubstantiated interpretation of the Rules of Professional Conduct as allegedly governing this situation, and given that reinstatement does not actually *require* any violation of the Rules of Professional Conduct, the majority cannot reasonably conclude that Menard has proven that allowing the reinstatement award to stand would violate any clear strong public policy. The most one can say (and one would be stretching to do so) is that a public policy violation might be possible in the future, leaving its actual realization uncertain and reasonably debatable. Under such circumstances, the arbitrators' award is not a clear and proven violation of a clear strong public policy. The majority's saying there's a violation of a clear strong public policy, and then saying it again, does not make it so. At worst, the arbitrators' award presents a reasonably debatable problem on lawyer ethics grounds.

¶ 100. Under such circumstances, the normal and well-established rules of deference to the arbitral process must prevail. These statements of the rules of deference are many:

¶ 101. "Where the parties have agreed to submit their dispute to binding arbitration, an award that is not

better than courts whether the damages a court is likely to award would be adequate because promisees are more familiar with the costs that breach imposes on them." Alan Schwartz, *The Case for Specific Performance,* 89 Yale L.J. 271, 277 (1979). Courts also recognize that a solution negotiated between the parties outside of court may reduce "the parties' expenditures on preparing and presenting evidence of damages, and the time of the court in evaluating the evidence." *Walgreen Co. v. Sara Creek Prop. Co., B.V.,* 966 F.2d 273, 276 (7th Cir. 1992).

*clearly* in violation of public policy should be given effect."[14]

¶ 102. "[C]ourts should not disturb the award merely because of disagreements with arbitral fact findings or because the arbitrator's application of the public policy principles to the underlying facts is imperfect. If the correctness of the award, including its resolution of the public policy question, is reasonably debatable, judicial intervention is unwarranted."[15]

¶ 103. It is abundantly clear that no violation of a clear, strong public policy is sufficiently manifest in the present case by either the process used by the arbitration panel or the arbitration award. Of the remaining grounds for vacating an arbitral award, as a strong public policy violation is absent, none otherwise apply.

¶ 104. Because reinstatement here does not violate a clear and strong public policy, the choice of remedy was for the arbitration panel. The panel had no way of anticipating that this court would use the present case to announce a clear, strong public policy against reinstatement. Resolution of the remedy was well within the panel's discretion.

¶ 105. To overturn the panel's exercise of discretion, a court must conclude that the arbitrators exceeded their powers. Wis. Stat. § 788.10(1)(d). A typical ground for arguing a panel has exceeded its powers is that the arbitrators manifestly disregarded the law.[16] "Manifestly disregarding the law" has been described as not understanding the law or correctly stating the law

[14] *Hackett v. Milbank, Tweed, Hadley & McCloy,* 654 N.E.2d 95, 102 (N.Y. 1995) (emphasis added).

[15] *Weiss v. Carpenter, Bennett & Morrissey,* 672 A.2d 1132, 1145 (N.J. 1996).

[16] *Racine County v. Int'l Ass'n of Machinists & Aerospace Workers,* 2008 WI 70, ¶ 11, 310 Wis. 2d 508, 751 N.W.2d 312.

but ignoring it.[17] "Manifestly disregarding the law" has also been described as "making no attempt to apply or interpret the relevant . . . law."[18]

¶ 106. The arbitration panel in this case was very thorough. It analyzed the law and correctly stated it. It made every attempt to apply its correct interpretation of the relevant law to the facts. The panel's reasoning is extremely detailed. In no way can these arbitrators be viewed as having manifestly disregarded the law.

¶ 107. In its resolution, the arbitration panel did no more than order one of several remedies it was entitled to choose from, a remedy that is often identified as the "preferred" remedy and which the panel was in fact obligated to consider.[19]

¶ 108. Reinstatement may be ordered even when the parties do not favor it and even when relationships between the parties are acrimonious. According to the case law, "reinstatement is not infeasible simply because a plaintiff claims that he or she does not get along with the employer or because the plaintiff claims that he or she is not comfortable working for someone who previously terminated him or her."[20]

¶ 109. Courts have explained that "[t]he equitable remedy of reinstatement requires . . . a delicate balance. On the one hand, reinstatement is the preferred remedy

---

[17] *Lukowski v. Dankert,* 184 Wis. 2d 142, 149, 515 N.W.2d 883 (1994).

[18] *Racine County v. Int'l Ass'n of Machinists & Aerospace Workers,* 310 Wis. 2d 508, ¶ 33.

[19] *Kempfer v. Automated Finishing, Inc.,* 211 Wis. 2d 100, 120, 564 N.W.2d 692 (1997) (holding that "[f]ront pay is only an available remedy in those cases in which . . . reinstatement is not feasible").

[20] *Id.*

for victims of discrimination. On the other hand, a [decision maker] is not required to reinstate a successful plaintiff where the result would be a working relationship fraught with hostility. A [decision maker] must be careful, however, not to allow an employer to use its anger or hostility toward the plaintiff for having filed a lawsuit as an excuse to avoid the plaintiff's reinstatement."[21]

¶ 110. The majority goes to great lengths to establish that in cases analogous to this one, reinstatement, although discretionary, may be "inappropriate." *See* majority op., ¶ 37–46. In its analysis of the remedial framework for Title VII violations, the majority uses the word "appropriate" or "inappropriate" at every turn. If the standard for vacating an arbitration award was when the award was "inappropriate," then the majority's treatment on this issue would be very persuasive indeed. But "inappropriate" is not the standard.

¶ 111. The majority's choice and use of case law on reinstatement only further reveals how far from the proper standard of review for arbitration the majority's analysis has strayed. The majority relies on federal cases in which either a federal district court is deciding the appropriate remedy or a federal appellate court is reviewing (and generally affirming) the discretionary decisions of the federal trial court.[22]

---

[21] *Bruso v. United Airlines,* 239 F.3d 848, 861 (7th Cir. 2001) (citations omitted).

[22] *EEOC v. Kallir, Philips, Ross Inc.,* 420 F. Supp. 919 (S.D.N.Y. 1976) (district court decision ordering front pay following a jury verdict finding wrongful termination); *Williams v. Pharmacia, Inc.,* 137 F.3d 944 (7th Cir. 1998) (reviewing a district court order denying reinstatement); *McNeil v. Econ. Lab., Inc.,* 800 F.2d 111 (7th Cir. 1986) (reviewing a

¶ 112. The majority's authority is thus drawn exclusively from cases in which an appellate court reviews a trial court judgment regarding reinstatement, applying normal appellate standards of review. The majority does not cite a single case in which a court reviews an arbitration panel awarding the remedy of reinstatement. In reviewing a trial court's judgment for

district court order denying front pay; *McKnight v. Gen. Motors Corp.*, 908 F.2d 104 (7th Cir. 1990) (reviewing a district court order denying reinstatement); *Taylor v. Teletype Corp.*, 648 F.2d 1129 (8th Cir. 1981) (reviewing a district court order denying reinstatement); *Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422 (Tenn. Ct. App. 1992) (reviewing a circuit court damages judgment for wrongful termination); *Whittlesey v. Union Carbide Corp.*, 567 F. Supp. 1320 (S.D.N.Y. 1983) (district court bench trial awarding the plaintiff damages over reinstatement); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir. 1992) (reviewing a district court judgment awarding front pay); *Cancellier v. Federated Dep't Stores*, 672 F.2d 1312 (9th Cir. 1982) (reviewing a judgment of a district court denying reinstatement); *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885 (3d Cir. 1984) (reviewing a district court decision limiting front pay to four months); *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945 (10th Cir. 1980) (reviewing a judgment from a special jury verdict awarding front pay); *Hoffman v. Nissan Motor Corp. in U.S.A.*, 511 F. Supp. 352 (D.N.H. 1981) (reviewing an amended jury verdict); *Dickerson v. Deluxe Check Printers, Inc.*, 703 F.2d 276 (8th Cir. 1983) (reviewing an order from a district court denying additional equitable relief); *Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321 (7th Cir. 1987) (reviewing a judgment from a district court denying both reinstatement and front pay); *Hyland v. Kenner Prods. Co.*, 13 Fair Empl. Prac. Cas. (BNA) 1309 (S.D. Ohio 1976) (reviewing a circuit court judgment denying plaintiff's attorney's fees); *Combes v. Griffin Television, Inc.*, 421 F. Supp. 841 (W.D. Okla. 1976) (awarding back pay and benefits in light of a jury verdict for the plaintiff finding wrongful termination).

reinstatement, an error of law would be sufficient for an appellate court to reverse the discretionary ruling of the trial court, applying an erroneous exercise of discretion standard of review.[23] In contrast, an error of law is not a sufficient basis for a court to overrule an arbitration award. A "court will not overturn the arbitrator's decision for mere errors of law or fact."[24] This rule is in accord with the recognition that the parties have contracted for the arbitrator's decision—not the court's.

¶ 113. The proper interpretation and application of SCR 20:1.7(a)(2) to the instant case are at most reasonably debatable. The effect of the application of the rule is uncertain and relies on the majority's assumptions. Therefore, no violation of a clear, strong public policy resulting from the arbitration panel's award can be clearly established. If the arbitrators erred in inter-

---

[23] *See, e.g., McNeil,* 800 F.2d 111 at 118 ("The decision whether or not to award front pay [rather than reinstatement] is, of course, within the discretion of the district court. We need only review the decision of the district court for an abuse of discretion"); *Taylor,* 648 F.2d 1129 at 1139 ("We cannot conclude that the district court abused its discretion in mandating reinstatement and, therefore, affirm that order"); *Cancellier,* 672 F.2d 1312 at 1320 ("Moreover, in view of the substantial verdict the judge did not abuse his discretion in [denying reinstatement]"); *Goss,* 747 F.2d 885 at 890–91 ("[W]e find no abuse of discretion in the choice of remedy . . . awarding [plaintiff] front pay in lieu of reinstatement"); *Coston,* 831 F.2d 1321 at 1332 ("[We determine] that the district court did not abuse its discretion in denying reinstatement").

[24] *Madison v. Madison Prof'l Police Officers Ass'n.,* 144 Wis. 2d 576, 585, 425 N.W.2d 8 (1988) (quoting *Milwaukee Bd. of Sch. Dirs. v. Milwaukee Teachers' Educ. Ass'n,* 93 Wis. 2d 415, 422, 287 N.W.2d 131 (1980)).

preting the rule, they made an error of law.[25] Yet as previously stated, the proper standard of review for an arbitration award dictates that an error of law does not justify vacating the award. Thus even allowing for the majority's stretches of interpretation and assumptions about outcome, the majority reaches an erroneous result.

¶ 114. In the end, the only thing that is "clear" from the majority's treatment of the present case is that the majority does not like the reinstatement award and has substituted its discretion for that of the arbitrators, in violation of the limitations on the court's standard of review.

¶ 115. Because no clear violation of a strong public policy is present here, and no other grounds exist for vacating the arbitration panel's award as exceeding its powers, the majority's analysis becomes little more than a strained analytical effort to overturn an arbitration award with which four members of this court disagree. The majority has improperly extended the authority of this court, at the cost of the well-established and highly deferential standard of review a court gives to arbitration awards.

¶ 116. For the reasons set forth, I write separately in dissent.

¶ 117. I am authorized to state that Justices ANN WALSH BRADLEY and N. PATRICK CROOKS join this opinion.

━━━━━━━━━━━━━━━━━

[25] In an attorney discipline case enforcing the rules, a referee would interpret and apply the rule, a question of law. This court would not be bound by the referee's interpretation or application, a question of law.